**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**William J. LYNN, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 17, 2013.
Filed Dec. 26, 2013.

Thomas A. Bergstrom, Philadelphia and Allison Khaskelis, New York, New York, for appellant.

Hugh J. Burns, Jr., Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

BEFORE: BENDER, P.J., DONOHUE, J., and MUSMANNO, J.

OPINION BY BENDER, P.J.

Appellant, Monsignor William J. Lynn, appeals from the judgment of sentence of 3–6 years' incarceration, imposed following his conviction under the pre-amended version of the endangering the welfare of children (EWOC) statute, 18 Pa.C.S. § 4304 (amended 2007).[1] Appellant presents ten questions for our review, generally falling into four categories. First, Appellant challenges the sufficiency of the evidence supporting his conviction by arguing, *inter alia*, that his conduct was not

---

1. Amended by Act 179 of 2006, adopted November 29, 2006 and effective January 29, 2007. Unless otherwise noted, all references to section 4304 are to the pre–2007 amended version.

within the reach of the EWOC statute, either as a principal or an accomplice. Second, he claims the trial court abused its discretion by improperly admitting evidence of twenty-one instances of prior bad acts. Third, Appellant asserts the trial court abused its discretion by improperly charging the jury. Fourth, he claims the trial court abused its discretion when it denied his motion for a mistrial following prosecutorial misconduct that occurred during the Commonwealth's closing argument. After careful review, we reverse.

## Factual Background

Appellant served as Secretary for Clergy ("Secretary") for the Archdiocese of Philadelphia ("Archdiocese") from June of 1992 until June of 2004. "During his tenure as Secretary . . . , in addition to solving disputes among priests, and ensuring that parishes were filled with enough priests, [Appellant]'s responsibilities included handling clergy sexual abuse issues." Trial Court Opinion (TCO), 4/12/13, at 3. In his capacity as Secretary, Appellant did not have direct authority to transfer, remove, or even restrict the nature of a priest's ministry.[2] Such powers rested with the Archbishop. Nevertheless, Appellant "was the sole 'funnel' for information concerning clergy sex abuse, and it was his office alone that could pass on vital information about priests and their young victims up the chain of command." TCO, at 4.

Appellant was one of a limited number of church officials with access to the Archdiocese's Secret Archives, a repository of information regarding any major infraction committed by a priest within the Archdiocese. In 1994, Appellant's investigation into allegations concerning an active priest, whom he found to have had engaged in serious past misconduct as documented within the Secret Archives, prompted Appellant "to conduct a comprehensive review of the priests within the Archdiocese[.]" Id. at 5. Appellant identified thirty-five priests who had previously been accused of sexual misconduct against minors and classified them into three categories: 1) 'pedophiles,' 2) priest 'guilty of sexual conduct with minors,' and 3) priests subject to 'allegations of sexual misconduct with minors with no conclusive evidence.' Id.

The first name that appeared under the heading 'guilty of sexual conduct with minors' was that of Reverend Edward V. Avery ("Avery"). In March of 1992, R.F. wrote to Appellant's predecessor, Monsignor Jagodzinski, regarding sexual abuse he suffered at Avery's hands during the 1970's when R.F. was an adolescent. In the letter, R.F. complained that Avery's abuse had "wreaked emotional havoc" on him as a youth, and he wrote to Jagodzinski out of concern for others that might be victimized. However, Jagodzinski was in the process of ending his term as Secretary, and R.F. did not receive a response until Appellant discovered the letter when he began his term as Secretary a few months later. After reading R.F.'s letter, Appellant arranged to meet with him in September of 1992.

At that meeting, attended by R.F., Appellant, and Reverend Joseph R. Cistone, R.F. "divulged the details of his relationship with Avery and how he was victimized." Id. at 7. The trial court reported R.F.'s allegations as follows:[3]

---

2. The sole caveat being that Appellant had the authority to remove a priest from a parish if that priest "admitted that he had abused someone." N.T., 5/23/12, at 77.

3. R.F. testified at Appellant's trial. Additional information regarding R.F.'s allegations in the trial court's factual summary derived from Appellant's own notes of their meeting.

R.F. was one of the altar servers who helped Avery serve Mass at St. Philip Neri.[4] "[Avery] had a lot of charisma. He was very popular with the young people; did a lot of things for the young people in the parish." R.F.'s relationship with Avery blossomed away from church. Avery gave R.F. his first beer at age 12. Avery took R.F. and other boys from their parish to his home in North Wildwood, NJ, where he provided alcohol. "There was generally beer there. And it was for anyone to consume." There were between eight and ten beds in Avery's loft, where all of the boys would sleep. Avery would come up to that area and wrestle with them. According to [Appellant]'s notes of that meeting, R.F. told him that during these encounters Avery's hand "slipped to [R.F.'s] crotch, at least on two or three occasions."

This pattern of inviting R.F. to participate in seemingly-innocuous activities, and then groping him when vulnerable, escalated when R.F. was 15 years old. Even after Avery was transferred from St. Philip Neri, he maintained a connection with R.F. through the phone and by inviting him to help disc jockey parties. In 1978, after assisting at a number of events at which Avery taught R.F. how to use the disc jockey equipment, Avery took R.F. to Smokey Joe's Cafe in West Philadelphia to help disc jockey a party for college students. Avery allowed the then 15–year–old to drink; after a few hours R.F. became ill and went to the bathroom where he vomited before passing out in a back hallway. Avery took R.F. back to the rectory, where he encouraged the boy to sleep in his bed.

When R.F. awoke several hours later, Avery's hands were inside his shorts.

In June 1981, when R.F. was 18, Avery again lured him to participate in what appeared to be an ordinary activity: Avery invited R.F. on a ski trip to Killington, Vermont. Avery, his brother and R.F. shared a hotel room. In the night, Avery joined R.F. in bed, and again molested the boy after he had gone to sleep. On this occasion, Avery massaged R.F.'s penis until he became erect and ejaculated.

*Id.* at 7–8 (internal citations to the record omitted). After the September, 1992 meeting, R.F. sought assurances from Appellant that Avery would not be permitted to harm anyone else. Appellant reassured R.F., telling him that "the Archdiocese's 'order of priorities is the victim, the victim's family, the Church, and the priest himself.'" *Id.* at 8.

A week later, Appellant met with Avery. At that meeting:

Avery denied R.F.'s account and expressed "shock" when [Appellant] told him that R.F. was going to counseling for this issue, [however,] Avery confirmed many of the details of R.F.'s story. Avery admitted that he took kids to his Shore house and "would roughhouse with them in the loft ...[.]" He admitted to sharing a bed with R.F. while on a ski trip to Vermont, but stated that if he touched R.F. in the night it was "accidental" due to "tossing and turning" because he had "gotten sick on some red sauce from dinner." Finally, Avery admitted that the night R.F. got drunk at Smokey Joe's Cafe, he took the boy back to the rectory, but did "not remember much about the events

---

4. The Secret Archives indicated Avery had previous issues with the Archdiocese prior to his molestation of R.F. which led to his transfer to St. Philip Neri in 1976. However, Archdiocese officials were cryptic in their description of Avery's misconduct at his prior parish, describing it as a "predicament" requiring the transfer so as to "avoid another breakdown." *Id.* at 8.

afterward, since he had so much to drink himself." He admitted it "could be" that something happened while he was under the influence of alcohol that he might not remember. "[Appellant] asked if he thought these things could have happened and Avery responded: I don't know." [Appellant] spoke with Avery on the phone about these allegations again two days later; the notes from that phone interview do not include a denial. Instead, Avery's retort to the allegations was, "[R.F.] has a selective memory."

*Id.* at 8—9.

Following R.F.'s allegations and Avery's tepid denials, Appellant "recommended that Avery be sent to an Archdiocese-affiliated mental health facility, St. John Vianney [5], for a four-day outpatient evaluation, starting on November 30, 1992." *Id.* at 9.

As part of the evaluation process, Sandra O'Hara, M.S., the Program Director at St. John Vianney, asked [Appellant] to complete a referral form with "detailed background on issues important for our consideration in assessing Father Avery." Despite Ms. O'Hara's re-

quest for details, [Appellant] did not include any information whatsoever about Avery touching R.F. while wrestling, placing his hands inside R.F.'s shorts in the rectory after disc jockeying at Smokey Joe's Cafe, or massaging R.F.'s penis until he ejaculated during their trip to Vermont. Instead, the defendant answered the question, "What specific behaviors/problems have you observed that cause you concern?" by writing, "When asked about these allegations, Fr. did admit to taking the minor into a place serving alcohol while he was disc jockey." [Appellant] also failed to mention that Avery admitted that it "could be" that something happened, and that he had reportedly been under the influence of alcohol. Though [Appellant] provided St. John Vianney with an incomplete, misleading referral,[6] the facility still recommended inpatient hospitalization. Cardinal Bevilacqua accepted that recommendation. Roughly six months after Avery was admitted to St. John Vianney Hospital, his primary therapist, Wayne Pellegrini, Ph.D., reported to [Appellant] that Avery "acknowledged that the incident [with R.F.] must have

---

**5.** Regarding that facility, the trial court noted the following:

Detective Joseph Walsh, a detective who participated in the long term investigation into clergy sex abuse in the Archdiocese of Philadelphia, described St. John Vianney as being the center "where priests that—were sent, priests that had problems dealing, basically, sexually abusing minors, alcohol treatment problems, psychological problems. The center itself was owned and operated by the Archdiocese, and they would send priests with problems to the center to be evaluated." St. John Vianney is located in Downingtown, Pennsylvania. *Id.* at 10 n. 17 (internal citations to the record omitted).

**6.** Here, the trial court's summary leaves the impression that Appellant did not indicate the real reason he referred Avery for an evaluation, or that he had misrepresented the rea-

son as being that Avery had provided alcohol to minors. This is not an accurate impression, as it is unsupported and, in fact, was contradicted by the record. The first question on the referral form asked, "What are the reasons for referral of this client for assessment?" Commonwealth's Exhibit C–26. Appellant responded, "Allegations of sexual misconduct made by an adult male against Fr. Avery. The male was in his teenage years when the alleged actions took place." *Id.* It is true, however, that Appellant did not convey the specific details of the allegations made by R.F., nor did he convey Avery's statement that something 'could' have happened while he was intoxicated, as indicated by the trial court. Nevertheless, the referral was not misleading regarding the purpose for which Appellant referred Avery for evaluation at the St. John Vianney Hospital.

happened. . . ." In addition, Dr. Pellegrini added, "there remains [sic] concerns about the existence of other victims." Dr. Pellegrini strongly recommended continued treatment in order to prevent future abuse: "Finally, Father Ed is at a point in treatment with his shame that necessitates continued inpatient treatment to prevent further acting out." On September 28, 1993, [Appellant] received the final pieces of information regarding Avery's sexual misconduct, treatment and plan for the future prior to his release from St. John Vianney on October 22, 1993. Dr. Pellegrini stated that Avery was not officially diagnosed with a "sexual disorder" because of "a number of reasons." The two reasons given were: "there is only one report of abuse" and "Father Ed had been drinking during those incidents, both by his and the victim's report." Though Dr. Pellegrini's team did not diagnose Avery with a sexual disorder, they still recommended that he receive continued outpatient treatment and that he receive an assignment where he would be separate from children:

> The treatment team's recommendations for Father Ed post discharge from the Villa include: One, continued outpatient treatment. Two, an aftercare integration team, ministry supervision. Three, a ministry excluding adolescents and with a population other than vulnerable minorities with whom Father Ed tends to overidentify [sic] with. Four, attendance at a 12–step [Alcoholics Anonymous] meeting for priests.

*Id.* at 10–11.

Appellant's first recommendation for Avery's reassignment within the Archdiocese did not conform to Dr. Pellegrini's advice; Appellant suggested that Avery be placed as an associate pastor at Our Lady of Ransom, a parish with a grade school. Appellant justified the placement in a letter to Monsignor Molloy [7] ("Molloy") based upon the fact that Avery had not been diagnosed as a pedophile, and because the priest at that parish had agreed to "work with a priest who requires some supervision." N.T., 3/27/12, at 51. Nevertheless, Cardinal Bevilacqua, the Archbishop, rejected Appellant's recommendation, and instead suggested that Appellant find a chaplaincy for Avery. Appellant obliged, and soon found an opening for Avery as a chaplain at Nazareth Hospital.

Although chaplains were able to reside at Nazareth Hospital, Appellant successfully petitioned the Cardinal to permit Avery to live in a rectory at St. Jerome's Church pursuant to Avery's request. In a letter dated December, 2, 1993, Cardinal Bevilacqua appointed Avery to the chaplaincy at Nazareth Hospital and residency at St. Jerome's, effective December 13, 1993. Father Joseph Graham ("Graham"), St. Jerome's pastor, was the only church official at St. Jerome's alerted regarding Avery's abuse of R.F. Graham was told by the Archdiocese that Avery "was not to be around children and was to live in the parish, be around other priests, and minister to the local hospital." N.T., 5/23/12, at 50. On February 18, 1994, Appellant placed Avery's name on the list of priests 'guilty of sexual conduct with minors,' demonstrating his belief that R.F.'s accusations against Avery were truthful. TCO, at 13; N.T., 3/27/12, at 15.

In the first year following Avery's discharge from St. John Vianney, Avery saw

---

7. At that time, Monsignor Molloy was Assistant Vicar for Administration and Appellant's immediate supervisor. In 1998, Molloy was promoted to Vicar for Administration. The Vicar for Administration answered to the Archbishop, Cardinal Anthony Bevilacqua, the organizational head of the Archdiocese.

a psychologist from that institution on a weekly basis. That psychologist notified Appellant on at least two occasions that Avery's aftercare integration team was slow to organize and that, afterwards, the group only met with Avery sporadically.[8] Then, in late November of 1994, Father Graham contacted Appellant and notified him that Avery had been working as a disc jockey at weddings. Around the same time, Appellant was notified by another chaplain at Nazareth Hospital, Father Kerper, that Avery "keeps accepting many outside commitments, especially on weekends. These commitments usually entail weddings or events where he is the disc jockey." N.T., 3/27/12, at 67. Those commitments had caused some discord with the hospital and with his fellow chaplains, the latter being repeatedly asked by Avery to cover his weekend shifts. In a follow up letter, Father Kerper also indicated that Avery was scheduled to perform as a disc jockey at a dance at St. Jerome's in December of 1994.[9]

In December of 1994, Avery met with his aftercare integration team (consisting of Appellant, Graham, and another priest) and his outpatient care providers from St. John Vianney. At that meeting, Avery was told by Appellant that he was committing too much time to his disc jockey activ-

ities. Appellant told Avery that Avery "must make a success of [the chaplaincy] assignment because he will never be assigned to parish work." Id. at 69. Appellant's notes of the meeting went on to state:

> Even though this had been said to him before, it seems as if this was the first time he was really ready and able to hear it. This did upset him. I also reminded him he should not have been doing the work as a disc jockey, that he should be concentrating on his work as Chaplain and his own recovery. This, too, seemed to be the first time he could hear what was said.
>
> We agreed he would work out therapy sessions with his therapist. He will continue to see his therapist and follow his aftercare plan. This was an upsetting session for him, but it seems as if he is just beginning to realize all the ramifications of past actions.

N.T., 3/27/12, at 69–70 (Commonwealth's Exhibit C–59 read into the record).

On February 22, 1995, Appellant received a letter from Avery's psychologist notifying him that she had agreed to decrease the frequency of Avery's sessions at Avery's request. She wrote that "this treatment approach for Father Avery con-

---

**8.** Appellant was a member of Avery's aftercare integration team.

**9.** There was no indication in Father Kerper's letter whether the dance worked by Avery in December of 1994 was a school event or for adults of the parish. However, Appellant's own testimony indicated that he knew it was a school event. N.T., 5/29/12, at 122–123. Responding that he understood that disc jockeying a grade school dance could be perceived as grooming behavior, Appellant stated, "Right. My understanding was that a teacher, or whoever it was in charge of the dance, asked him to do it and Graham told the teacher never do that again." Id. at 123. However, Appellant did not identify disc jock-

eying as grooming behavior in Avery's case. When asked if his subsequent advice to Avery that Avery should not be disc jockeying was based upon Avery's abuse of R.F. after having invited R.F. to assist at a disc jockeying event, Appellant answered: "I did not equate the two. As I said before, he was abused the night he helped Avery with disc jockeying, but that was after he was abused on a skiing trip, too, you know. So-but the disc jockeying, the way I understood it from the therapist, was that was part of his ... [mania.]" Id. Appellant was not aware of any other instances of Avery's disc jockeying events for children. He testified that "It was a one-time thing and it stopped." Id. at 124.

tinues to be positive and I anticipate he will continue to progress toward the goals we have discussed[,]" but noted that "[i]f he appears to be having difficulty" complying with his treatment regimen under the revised schedule, "the frequency of his sessions will increase according to need." Commonwealth's Exhibit C–60. Father Kerper repeatedly raised concerns about Avery's shirking of his duties as chaplain at Nazareth Hospital until September 27, 1995. At that time, however, Appellant "instructed Father Kerper to convey his concerns about Avery to his supervisor at Nazareth Hospital, not to the Secretary for Clergy." TCO, at 15.

From the time R.F.'s accusations first came to light in 1992 until 1996, R.F. repeatedly wrote to Appellant to inquire about how the Archdiocese was dealing with Avery. For instance, on September 17, 1996, R.F. e-mailed Appellant and therein stated, "I'm not asking for details[,] what I want to know is[,] is he rehabilitated or in a situation where he can't harm others. Will the diocese vouch for the safety of its children. For my peace of mind I need to know." TCO, at 15 (quoting Commonwealth's Exhibit C–75). There was no evidence that Appellant ever responded to R.F.'s email. Detective Joseph Walsh, an investigator who "culled and compiled records of the Archdiocese[,]" testified that as of September of 2002, "there were no documents suggesting that the defendant followed up on R.F.'s concern for other victims." TCO, at 16.

In 1997, Appellant made efforts "to help advance [Avery's] career." *Id.* Avery wrote the Cardinal to ask for a letter of recommendation in order to pursue a doctoral degree from the Lutheran Theological Seminary of Philadelphia. The letter was passed on to Appellant by the Cardinal's representative with instructions to handle the matter as the Cardinal's delegate. The trial court described the content of that letter and Appellant's follow-up with Avery as follows:

> [Appellant] authored a letter describing Avery as a "very sincere, hard[-]working priest. He is honest and trustworthy. He is a man who is in touch with his spiritual life and this becomes evident in his work and service." A few weeks later, [Appellant] followed up with Avery about the letter of recommendation. Even though [Appellant] portrayed Avery as "trustworthy" to the Lutheran Theological Seminary, he told the priest that "in the future he should play things low-key," and that he had to be "more low-key than he has been recently."

TCO, at 16 (internal citations omitted).

Avery remained in outpatient treatment with St. John Vianney therapists until 1998, and had regularly attended Alcoholics Anonymous meetings for the first two years after his discharge in 1993. Nevertheless, after meeting with Avery in April of 1998, Appellant expressed concerns about Avery's rehabilitation. In a note placed in Avery's Secret Archive file, Appellant wrote that Avery was "minimiz[ing] his experience ... and the allegations against him." TCO, at 17 (quoting Commonwealth's Exhibit C–83). During the April, 1998 meeting, Appellant told Avery that he would not recommend him for a position in another diocese because such a recommendation would require Appellant to certify that the priest seeking the transfer "has not had allegations against him." *Id.*

In the fall of 1998, D.G., a ten-year-old boy just beginning the fifth grade, commenced training to serve as an altar boy at St. Jerome's. D.G. was also a student at St. Jerome's grade school. He advanced quickly in his training and, by the end of his first semester that year, he was a "full-

fledged altar boy." TCO, at 17. D.G. began assisting the priests of St. Jerome with Mass both on weekends and before school on weekdays. He received a schedule from the parish on which he and the other altar boys were given their Mass assignments up to a month in advance.

D.G. recalled serving Mass with four priests: Graham, Avery,[10] Englehardt, and McBride. At some point during the winter of 1998 to 1999, Englehardt began sexually abusing D.G. after Masses.[11] Englehardt referred to these events as "sessions." In early 1999, D.G. encountered Avery inside the church after school on a Friday. Avery pulled D.G. aside and told him that he heard about D.G.'s "sessions" with Father Englehardt, and that "ours were going to begin soon." N.T., 4/25/12, at 126. A week later, D.G. was serving weekend Mass with Avery when Avery told him to stay after the service because their "sessions" were going to begin.

As Mass ended that day and the parishioners cleared out, D.G. and another altar boy began cleaning up. Eventually the other altar boy left, leaving D.G. alone with Avery.[12] Avery took D.G. into the sacristy,[13] turned music on, and ordered D.G. to striptease for him. Avery then fondled D.G.'s penis and performed oral sex on him. Avery also penetrated D.G.'s anus with his finger. He then ordered D.G. to perform oral sex on him. Eventually, Avery ejaculated on the boy's neck and chest. D.G. recalled that Avery told him "[t]hat I'm doing good. God loves me. This is what God wants, and it's time for me to become a man." N.T., 4/25/12, at 132. Two weeks later, after D.G. served Saturday Mass with Avery, Avery subjected D.G. to another "session." D.G. was sexually abused in a similar fashion as the previous occasion, with the additional indignity of having Avery lick his anus. Afterward, Avery told D.G. that he did a good job, God loved him, and that Avery would be seeing him again soon. *Id.* at 140.

Avery did not abuse D.G. after the second incident, as D.G. found ways to avoid Avery by switching his scheduled Masses with other altar boys. Nevertheless, the effect of the sexual abuse committed by Avery was devastating. "Leading up to his sixth grade year, D.G. had become withdrawn and began using drugs. Alcohol and marijuana [abuse] gave way to [abuse] of Percocet[ ], Oxycontin, and Xanax, until D.G. developed a full blown heroin addiction." TCO, at 18. Avery's abuse of D.G. was not reported to the Archdiocese until January 30, 2009, by which time the Appellant was no longer Secretary for Clergy. Appellant left that position to become the pastor at St. Joseph's Parish on June 28, 2004.

10. The evidence demonstrated that Avery was not authorized by the Archdiocese to perform or serve Mass at St. Jerome's; his sole responsibility was to his chaplaincy assignment. However, it appears that many of the priests who lived at St. Jerome's rectory were expected by Graham to help out around the parish. It is not clear from the record how frequently Avery performed/served Mass at St. Jerome's, nor the extent to which Appellant knew Avery was performing that function (if at all), and that he was doing so unsupervised.

11. At Appellant's trial, testimony was limited regarding Englehardt's abuse of D.G. because, although Englehardt lived at the St. Jerome's rectory with Avery and the other priests, he belonged to a separate order within the Catholic Church that was not under the supervision of the Archdiocese.

12. D.G. testified that when he served Mass with Avery, Avery was not being supervised by Graham or anyone else.

13. A sacristy is a room for keeping vestments and other church artifacts, often located near or behind the main altar.

Two years after Avery's abuse of D.G. concluded, the child sex abuse scandal in the Archdiocese of Boston erupted, causing leaders in the Catholic Church to reexamine the manner in which they dealt with priests accused of sexually abusing minors. Consequently,

> leaders of the Catholic Church met in Dallas in June 2002 and produced the "Dallas Charter," which set forth requirements that the Diocese[s] around the nation had to follow when it came to child sex abuse. The "Dallas Charter" is a document in which the bishops of the United States "pled [sic] to the Catholics of the United States that they would offer proper care, spiritual, psychological care, to victims of sexual abuse by the clergy and offer prompt and proper investigation of accusations and dealings with those accused." As part of that promise, the Charter required each Diocese to establish a Review Board to evaluate and act upon allegations of clergy sex abuse. Additionally, the Charter eliminated the possibility of restricting a priest's ministry. While the scandal in Boston and the Dallas Charter were visible turning points in the Church's public stance on allegations of sexual misconduct, canonical law had always prohibited clergy sex abuse. For example, "No. 8 of the Essential Norms," which was in place long before 2002, stated:

> > When even a single act of sexual abuse by a priest or deacon is admitted or is established after an appropriate process in accord with canon law, the offending priest or deacon will be removed permanently from ecclesiastical ministry, not excluding dismissal

from the clerical state, if the case so warrants.

TCO, at 18–19.

On June 20, 2002, R.F.'s brother contacted Appellant and revealed that he had also been sexually abused by Avery when he was 14 or 15 years old. He also told Appellant that Avery had been seen recently disc jockeying local parties. On June 3, 2003, Appellant initiated an investigation, under the new regimen instituted by the Dallas Charter, into the accusations made against Avery "on or about September 28, 1992, which resurfaced on or around June 19, 2002." N.T., 3/27/12, at 101 (Commonwealth's Exhibit C–94). On September 27, 2003,

> the Archdiocesan Review Board found that Avery was "in violation of the Essential Norms defining sexual abuse of a minor," and concluded that he should be removed from active ministry as well as from the rectory living situation, "or any other living situation in which he would have unrestrained access to children now or in the future." On December 5, 2003, Cardinal Justin Rigali [Cardinal Bevilacqua's successor] signed a decree excluding Avery from ministry, prohibiting him from residing in "any ecclesiastical residence without the permission of the Archbishop" and from celebrating or concelebrating public Mass or administering the sacraments.

On June 20, 2005, Cardinal Rigali requested that Avery be laicized. On August 13, 2005, Avery wrote to the Vatican, requesting laicization.[14] On January 20, 2006, Pope Benedict XVI granted Avery dispensation from all priestly obligations.

TCO, at 19–20.

At trial, the Commonwealth also introduced copious evidence of prior bad acts

---

**14.** 'Laicization' is a process which takes from a priest or other cleric the use of his powers, rights, and authority.

concerning Appellant's handling of twenty other priests accused of molesting minors and similar transgressions. TCO, at 20–132. That evidence was offered to aid the jury in understanding Appellant's "intent, knowledge, motivation and absence of mistake when handling Avery's case[.]" TCO, at 20.

## Procedural History [15]

This case was initiated by a criminal complaint charging Appellant with two counts each of EWOC, 18 Pa.C.S. § 4304, and conspiracy to commit EWOC, 18 Pa. C.S. § 903, relating to his supervision of Avery and another priest, Reverend James Brennan ("Brennan"). Initially, both Avery and Brennan were scheduled to be tried alongside Appellant as co-defendants. However, Avery pled guilty to involuntary deviate sexual intercourse [16] and conspiracy to commit EWOC on March 22, 2012, after the jury had been selected but before the Commonwealth began presenting its case. Brennan remained as Appellant's co-defendant until the case concluded.

Appellant's and Brennan's jury trial commenced on March 26, 2012. The Commonwealth rested its case on May 17, 2012 and, at that time, the trial court granted Appellant's motion for judgment of acquittal with regard to the Brennan-related conspiracy count, but denied the motion with respect to the remaining counts. The trial ended on June 22, 2012, when the jury returned a verdict of guilty with respect to the Avery-related EWOC charge, and acquitted him of the Avery-related conspiracy and Brennan-related EWOC charges.[17] Appellant did not file post-sentence motions.

On July 24, 2012, the trial court sentenced Appellant to a term of 3–6 years' incarceration for EWOC, graded as a third-degree felony.[18] Appellant filed a timely notice of appeal on August 8, 2012, and complied in a timely fashion with the trial court's order to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The trial court eventually filed its 1925(a) opinion on April 12, 2013.

**15.** Prior to this case, a grand jury was empanelled in 2002 at the behest of then Philadelphia District Attorney, Lynne Abraham, to investigate the Archdiocese's treatment of allegations of sexual abuse against its priests. Appellant and other Archdiocese officials repeatedly testified before that grand jury. Concluding in 2005, the investigation resulted in a scathing 400-page report, but no criminal indictments.

The report concluded that the pre–2007 EWOC statute did not criminalize the actions of Archdiocesan officials, such as Appellant, despite obvious shortcomings in their supervision of sexually abusive priests:

As defined under the law, ... the offense of endangering the welfare is too narrow to support a successful prosecution of the decision-makers who were running the Archdiocese. The statute confines its coverage to parents, guardians, and other persons "supervising the welfare of a child." High level Archdiocesan officials, however, were far removed from any direct contact with children.

Grand Jury Report of September 15, 2005, Misc. No. 03–00–239, at 65.

Act 179 of 2006, effective January 29, 2007, amended the EWOC statute to include "a person that *employs or supervises*" a parent, guardian or other person supervising a child. 18 Pa.C.S. 4304(a)(1) (current) (emphasis added). Given the pre–2007 timeframe of Appellant's conduct, the amended statute is not applicable in this case.

**16.** 18 Pa.C.S. § 3123.

**17.** The jury failed to reach a verdict on any of the charges pending against Brennan.

**18.** EWOC is a third-degree felony, rather than a first-degree misdemeanor, "where there is a course of conduct of endangering the welfare of a child[.]" 18 Pa.C.S. § 4304(b).

Appellant presents the following questions for our review:

1. Whether the pre-amended version of 18 Pa.C.S.A. § 4304 (endangering the welfare of children) ("EWOC") did not properly apply to Appellant, Msgr. William Lynn, who was not a parent, guardian or other person supervising the welfare of a child and who had no direct involvement with the child, never met and never knew the child, and whether Appellant's trial as a supervisor under EWOC was a violation of the *ex post facto* clauses of the U.S. and Pennsylvania Constitutions?

2. Whether the trial court erred in allowing the jury to deliberate on whether Appellant can be liable for EWOC as a principal or an accomplice when the Commonwealth failed to provide sufficient evidence to meet its burden of proving that Appellant violated each element of the crime, as either a principal or an accomplice?

3. Whether the lower court's refusal to provide a jury instruction on the definition of person supervising the welfare of a child consistent with *Commonwealth v. Brown,* 721 A.2d 1105 (Pa.Super.1998)[,] and the model jury charge was reversible error mandating a new trial?

4. Whether the lower court's jury charge on the EWOC element of "knowingly," which provided two directly conflicting definitions, was reversible error mandating a new trial?

5. Whether the lower court's jury charge on the EWOC element of "duty of care," which presupposed that the duty of care element was met and provided examples from civil, rather than criminal, law was reversible error mandating a new trial?

6. Whether the lower court's undue emphasis on accomplice liability, as well as an erroneous definition of accomplice intent, during its jury charge was reversible error mandating a new trial?

7. Whether the lower court's jury charge about Appellant's liability for endangering other unnamed minors supervised by Edward Avery, when there is no support in Pennsylvania law that EWOC applies to unknown and unknowable children, is reversible error mandating a new trial?

8. Whether the lower court's jury instruction on whether endangering the welfare of a child behavior must be criminal, which permitted the jury in this case to wrongly infer that Appellant violated EWOC, even though there is no underlying criminal conduct that Appellant was aware of, was reversible error mandating a new trial?

9. Whether it was abuse of discretion for the lower court to admit evidence of acts of abuse by 21 other priests, dating to the late 1940's, pursuant to Rule 404(b) of Pa. R. Evid., and did the [c]ourt err in holding that this evidence passed the probative/prejudicial test of Pa. R. Evid. 403?

10. Whether it was abuse of discretion for the lower court not to grant a mistrial on the basis of the Commonwealth's highly prejudicial summation which included numerous statements not supported by the trial record?

Appellant's Brief, at 4–5.

Appellant's first two claim address, *inter alia,* the sufficiency of the evidence supporting Appellant's conviction for EWOC. The first concerns his culpability as a principal actor, and the second concerns his culpability as an accomplice. Because of our ultimate disposition with regard to these two claims, we do not reach the remainder of Appellant's allegations of error.

## Standard of Review

Both of Appellant's sufficiency claims require an identical scope and standard of review. The question of whether evidence is sufficient to sustain a verdict is a question law, and as such, "our standard of review is *de novo* and our scope [of review] is plenary." *Commonwealth v. Cruttenden,* —— Pa. ——, 58 A.3d 95, 96 n. 1 (2012). It is well-established that:

Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Widmer,* 560 Pa. 308, 744 A.2d 745, 751 (2000); *see also Commonwealth v. Maerz,* 879 A.2d 1267, 1269 (Pa.Super.2005) (stating "[w]hile we are not free to substitute our view of the evidence for the factual findings of the trial court, we as an appellate court are authorized, indeed required, to use a plenary scope of review in determining the validity of the legal conclusions made by the trial court.").

## Conviction for EWOC as a Principal

It is undisputed that Appellant was tried under the pre-amended version of the EWOC statute. Prior to January 29, 2007, the statute read: "A parent, guardian or other person supervising the welfare of a child under 18 years of age commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support." 18 Pa.C.S. § 4304(a)(1). The 2007 amendment added language, *inter alia,* such that the statute now reads: "A parent, guardian or other person supervising the welfare of a child under 18 years of age, *or a person that employs or supervises such a person,* commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support." 18 Pa.C.S. § 4304(a) (current) (emphasis added).

It is undisputed that Avery was supervising D.G. when he sexually abused the boy. It is also undisputed that Appellant did not have any direct supervisory role over D.G. or any other child put at risk by Avery's presence at St. Jerome's. The Commonwealth's contention at trial was that Appellant, in his capacity as the Archdiocese's point-man on priests accused of sexual abuse, violated the pre-amended EWOC statute by placing Avery in an environment where he knew there was a significant risk that Avery would sexually abuse minors (or by failing to remove him once there were indications that Avery might reoffend). Thus, independent of whether Appellant owed a duty of care to the children of St. Jerome's, or to D.G. in particular, the prohibited conduct of his alleged violation of the EWOC statute was his inadequate supervision of Avery.

Appellant claims the pre-amended EWOC statute did not encompass the conduct of *a supervisor of* a "person supervising the welfare of a child." He contends that by the plain meaning of the terms of the pre-amended statute, it imposed criminal liability only upon those directly supervising children. He maintains that decisional law examining the pre-amended statute limited the class of persons subject to criminal liability to "parents and parental surrogates." Appellant's Brief, at 19. Appellant also directs our attention to the

2007 amendment language as a compelling indication that the prior version of the statute, the one under which Appellant's conviction rests, did not encompass persons described by the additional language, *i.e.,* those who employ or supervise the class of individuals that were within the purview of the pre-amended version. In essence, he argues that the legislature's inclusion of the "or a person that employs or supervises such a person" language in the amended statute indicated an intent to add a class of persons not originally subject to liability under the pre-amended version.

The Commonwealth contends the plain meaning of the pre-amended statute clearly encompassed the class of persons added by the 2007 amendment and, thus, the amendment was merely a clarification of, rather than a substantial change of, the pre-amended statute's scope of liability. The Commonwealth further argues the case law addressing the pre-amended EWOC statute's broad reach supports that interpretation. Furthermore, the Commonwealth believes Appellant misconstrues the plain language of the statute by limiting the phrase "person supervising the welfare of a child" to apply only to those persons who directly supervise a child. The Commonwealth maintains that the terms "the welfare of" are rendered superfluous by such an interpretation, in contravention of the well-settled principles of statutory construction.

■■■ "In a case involving a question of statutory interpretation, we are subject to the rules of statutory construction enacted by the legislature and embodied in 1 Pa. C.S.A. § 1901 *et seq.*" *Commonwealth v. Berryman,* 437 Pa.Super. 258, 649 A.2d 961, 965 (1994). Section 1921 provides as follows:

(a) The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions.

(b) When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.

(c) When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

(4) The object to be attained.

(5) The former law, if any, including other statutes upon the same or similar subjects.

(6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.

1 Pa.C.S. § 1921.

■■■ Accordingly, when this Court seeks to

ascertain[ ] the meaning of a statute, it is our obligation to determine the intent of the legislature and give effect to that intention.

We are to give the words of a statute their plain and ordinary meaning. The words are to be considered in their grammatical context. 1 Pa.C.S.A. § 1930. The scope of "grammatical context" includes the tenses of verbs used in a statute.

[S]ections of statutes are not to be isolated from the context in which they arise such that an individual in-

terpretation is accorded one section which does not take into account the related sections of the same statute. Statutes do not exist sentence by sentence. Their sections and sentences comprise a composite of their stated purpose.

*Commonwealth v. Lurie,* 524 Pa. 56, 60, 569 A.2d 329, 331 (1990) (quoting *Commonwealth v. Revtai,* 516 Pa. 53, 63, 532 A.2d 1, 5 (1987)). An interpretation of the language in a section of a statute must remain consistent throughout the statute.

. . .

▆ Further, a statute should be interpreted as a whole, . . . giving effect to all of its provisions if possible. Every word, sentence or provision of a statute is intended for some purpose and accordingly must be given effect.

*Berryman,* 649 A.2d at 965—66 (some internal citations omitted).

▆ When applying these rules to the construction or interpretation of a criminal statute, additional considerations apply. Generally, statutes are to be liberally construed as to give proper effect to the intent of the legislature; however, penal provisions "shall be strictly construed[.]" 1 Pa.C.S. § 1928(b)(1). Nevertheless,

strict construction does not require that the intent of legislature be disregarded. Further, language which is capable of more than one meaning can be clear and unmistakable in the context of its usage by the selection of the meaning which is neither forced nor strained. It is only when a statute has two reasonable constructions, the construction which operates in favor of the defendant's liberty must be applied, not the construction supported by the greatest reason.

*Berryman,* 649 A.2d at 966–67 (internal citations omitted).

Here, the statute in question identifies three groups of people potentially subject to criminal liability for EWOC. The first two groups are not subject to dispute; the statute applies, in unambiguous terms, to a "parent" or a "guardian" of a child, if that parent or guardian "knowingly endangers the welfare of the child by violating a duty of care, protection or support." 18 Pa.C.S. § 4304(a). At issue in this case is the scope or breadth of a class of individuals subsumed in the phrase, "or other person supervising the welfare of a child[.]" *Id.* It is undisputed that Appellant was not, in any literal sense, supervising any child at St. Jerome's. He contends, therefore, that the pre-amended statute could not apply to him.

We begin with a review of the prior decisions of the Courts of Pennsylvania defining the scope of the EWOC statute. In *Commonwealth v. Mack,* 467 Pa. 613, 359 A.2d 770 (1976), our Supreme Court considered a facial challenge to the EWOC statute alleging that it was unconstitutionally vague. The Supreme Court found that the terms of the statute were indeed imprecise, but not unconstitutionally vague, because, like any statute pertaining to juveniles, the EWOC statute was intended "to cover a broad range of conduct in order to safeguard the welfare and security of our children." *Id.* at 772 (quoting *Commonwealth v. Marlin,* 452 Pa. 380, 305 A.2d 14, 18 (1973)). Despite the apparent vagueness of the terms defining a violation of the statute, the Court held that "[a]n individual who contemplates a particular course of conduct will have little difficulty deciding whether his intended act 'endangers the welfare of the child' by his violation of a 'duty of care, protection or support.'" *Id.* The *Mack* Court explained:

[S]tatutes such as the one at issue here are to be given meaning by reference to

the 'common sense of the community' and the broad protective purposes for which they are enacted. With these two factors in mind, we believe that section 4304 is not facially vague. Phrases such as 'endangers the welfare of the child' and 'duty of care, protection or support' are not esoteric. Rather, they are easily understood and given content by the community at large.

*Id.*

Thus, *Mack* instructs that the terms of the EWOC statute are, at least to some degree, intentionally imprecise so as to encompass a wide range of conduct, commensurate to the statute's broad, protective purpose. Nevertheless, neither this Court nor our Supreme Court has ever affirmed a conviction for EWOC where the accused was not actually engaged in the supervision of, or was responsible for supervising, the endangered child. In fact, in *Commonwealth v. Halye*, 719 A.2d 763 (Pa.Super.1998) (*en banc*), this Court reversed an EWOC conviction because the Commonwealth "failed in its burden of proving that the [a]ppellant was in the position of supervising the children" under the following circumstances:

At trial the victim's mother testified that [the] [a]ppellant, who was her second or third cousin, had come to her home with her former mother-in-law for a visit. The witness stated that her husband, her son and her daughter were also at home that evening. The children were playing in a bedroom while the adults were in another part of the home. At one point, [the] [a]ppellant indicated that he had to go to the bathroom. When he did not promptly return, and the children became quiet, the mother testified that she became concerned and walked back to the bedroom to check on them. Her daughter was seen sitting on the edge of the bed playing a game by

herself. Upon opening a closet door, [the] [a]ppellant was discovered with his head placed near her son's exposed privates.

*Halye,* 719 A.2d at 764–65.

Explaining our decision to reverse, we reasoned:

Despite the criminal nature of [the] [a]ppellant's actions, which support his convictions for involuntary deviate sexual intercourse, indecent assault and corruption of minors, there is insufficient evidence of [the] [a]ppellant's role as a supervisor or guardian of the child to support the endangering the welfare of children conviction. No testimony was presented to indicate that [the] [a]ppellant was asked to supervise the children or that such a role was expected of him. Rather, [the] [a]ppellant was a visitor in the child's home. The child's parents were home and were supervising their children. This is evidenced by the mother's remarks that her concern for the children led her to check on them and to discover the assault by [the] [a]ppellant.

*Id.* at 765.

Here, the trial court rejected Appellant's argument that the evidence was insufficient as a matter of law because Appellant had no supervisory role for the children of St. Jerome's. The trial court determined that "the statute does not require that an individual be a 'supervisor of a child' to fall under EWOC's umbrella of criminal liability." TCO, at 183. The trial court explained:

The difference between a "person supervising the welfare of a child" and a "supervisor of a child" is syntactically small, but far from trivial. The first element of the statute is satisfied when a defendant supervised the welfare of a child. In other words, the Commonwealth could have satisfied its burden to

establish this element of the offense by showing that the defendant oversaw, managed, or had authority over the well[-]being of children. *See* Random House Dictionary 2013 (defining "supervise" as "to oversee (a process, work, workers, etc.) during execution of performance; superintend; have the oversight and direction of").

This reading of the EWOC statute is not only consistent with a literal interpretation of the statute's language; it is also consistent with the longstanding and steadfast position that any statute designed to protect children must be read broadly. *Commonwealth v. Mack* [467 Pa. 613], 359 A.2d 770, 772 (Pa.1976). These statutes "are to be given meaning by reference to the ... broad protective purposes for which they are enacted." *Id.* Specifically, the EWOC statute "attempts to prohibit a broad range of conduct in order to safeguard the welfare of children." *Brown,* 721 A.2d at 1107. As a result of the statute's protective purpose, our Supreme Court has explicitly instructed lower courts interpreting this provision to do so according to "the common sense of the community," as well as "the sense of decency, propriety and the morality which most people entertain." *Mack,* 359 A.2d at 772; *Commonwealth v. Marlin* [452 Pa. 380], 305 A.2d 14, 18 (Pa.1973), quoting *Commonwealth v. Randall* [183 Pa.Super. 603], 133 A.2d 276, 280 (Pa.1957).

Viewing the evidence in the light most favorable to the verdict winner, the Commonwealth proved beyond a reasonable doubt that [Appellant] controlled sexually abusive priests, and that it was his responsibility to protect the children of the Archdiocese of Philadelphia from future harm. As the person who handled all issues concerning clergy sex abuse, the defendant oversaw where priests who had been accused of sexual misconduct with minors worked, lived, and spent time. It could be argued that every time a sexually abusive priest had access to a child, the child's welfare was endangered. Conversely, it could be argued that every time [Appellant] facilitated the placement of a sexually abusive priest in a position where he would be unable to have contact with a child, the child was removed from danger. Accordingly, deriving all reasonable inferences from the evidence which was presented at trial, viewed in the light most favorable to the Commonwealth, the evidence was sufficient to establish that [Appellant] was a "person supervising the welfare of a child."

*Id.* at 183–85 (footnotes omitted).

In its Letter Brief, the Commonwealth endorses the trial court's distinction between 'actual supervision of children' and 'supervision of the welfare of children' as the basis for Appellant's liability for EWOC. Noticeably absent from the trial court's analysis is any mention of the *Halye* decision which, even if not controlling authority in a strict sense, clearly addresses the element at issue. *Halye* appears to conflict with both the trial court's and the Commonwealth's interpretation of the EWOC statute that actual/direct supervision of a child is not required for an EWOC conviction under the pre-amended version of the statute. The Commonwealth attempts to distinguish *Halye* in a footnote, arguing:

The case that in [Appellant]'s view "captures this Court's interpretation" of the statute, [*Halye* ], in fact announces no general "interpretation" (unlike ... *Mack* ), but merely applies the facts to the law. As [Appellant] idiosyncratically puts it, Halye was not guilty under § 4304 "even though [he] knew the children and was the only adult in the room" ( [A]ppellant's brief, 22). Halye

was the "only adult in the room" because he was sexually molesting one of the children in the room. This Court unsurprisingly concluded that Halye's doing so did not somehow create a duty of care on his part. This, of course, says exactly nothing about the overall scope of the statute, nor does it suggest that [Appellant], who had a duty of care, is somehow equivalent to Halye, who had none.

Commonwealth's Letter Brief, at 19 n. 8.

The Commonwealth's argument is faulty for several reasons. First, it is unmistakable that the *Halye* Court considered actual supervision of children to be an element of the offense of EWOC:

> There is insufficient evidence to sustain a conviction for child endangerment where the Commonwealth fails to prove any statutory element. In this matter, viewing the evidence in the light most favorable to the Commonwealth, we conclude that it failed in its burden of proving that [the] [a]ppellant was in the position of supervising the children at the time of the assault.

*Halye,* 719 A.2d at 765.

Second, the Commonwealth's argument conflates the supervision and duty elements of the statute. The *Halye* Court did not address, in any fashion, whether Halye had a duty of care, protection or support with respect to the child victim in that case. The *Halye* Court based its decision solely on the Commonwealth's failure to prove that Halye "was in the position of supervising the children...." *Halye,* 719 A.2d at 765.

The distinction between the supervision and duty elements was addressed in *Brown.* In that case, the appellant attempted to argue that he was "not supervising the welfare of a child" because "he did not have a duty to report the abuse he witnessed" being inflicted on the child vic-

tim by the victim's mother, who was Brown's friend, and who resided with Brown in his residence. This Court dismissed his argument because we found that "[a]rguing that [an appellant] did not violate a duty does not address whether or not he was within the scope of the statute as a 'person supervising the welfare of a child.'" *Brown,* 721 A.2d at 1107. We considered Brown's argument "circular" and found that it "addresses a separate element of the crime." *Id.* Conversely, the Commonwealth's attempt to distinguish *Halye* from the instant case on the basis that Halye had no duty of care, protection or support, whereas Appellant did have such a duty, conflates or otherwise ignores the distinction between the supervision and duty elements of the EWOC statute.

Third, the Commonwealth's characterization of *Halye* as a case that "merely applies the facts to the law" is worthy of consideration, but is hardly a basis upon which to justify ignoring the import of the decision's legal conclusions. The legal question before this Court is whether the accused must be a supervisor of a child for culpability to arise under the EWOC statute. *Halye* directly confronted that legal issue, albeit in a different factual context. *Mack,* on the other hand, while providing a general outline of the legislative purpose behind the EWOC statute, did so in a completely different legal context, that being the consideration of whether the statute, as a whole, was unconstitutionally vague. *Mack* certainly guides us on the question of legislative intent, but that case offers little guidance on the precise matter before us, which deals with the interpretation of a specific element of the EWOC statute. While we must be mindful to interpret the statute in a manner that gives effect to the intent of the legislature, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it

is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). Thus, we turn to the statute to ascertain its plain meaning.

■ Having failed to consider the compelling implications of *Halye*, which directly considered the element in question, and having relied to an excessive extent on the broad mandate outlined by *Mack*, which did not discuss the element in question at all, the trial court's endeavor at statutory construction of the pre-amended EWOC statute was fundamentally flawed in this case. Independent of the guidance provided by those authorities, however, the trial court's parsing of the terms "the welfare of" is not a reasonable construction because it adds ambiguity where none need exist. The plain meaning of the statute requires that, for a person who is not a parent or a guardian of the endangered child to be subject to criminal liability, he must at least be engaged in the supervision, or be responsible for the supervision, of "a child."

Contrary to the Commonwealth's argument, such a reading does not render the term "welfare" redundant in contravention of the principle of statutory construction that we give effect to all of the EWOC statute's provisions. "Welfare," as defined by the American Heritage Dictionary, means "health, happiness, or prosperity; well-being." AMERICAN HERITAGE DICTIONARY 923 (4th ed. 2001). Similarly, Black's Law Dictionary defines the term as "[w]ell-being in any respect; prosperity." BLACK'S LAW DICTIONARY 1625 (8th ed. 1999). In the context of the phrase, "person supervising the welfare of a child," the term "welfare" does not eviscerate the requirement of supervision.[19] Rather, the statute endeavors to protect a child's overall well-being, such as to include the emotional, psychological, and overall health of the child. The term operates to make clear that supervision encompasses more than protection from physical harm or the risk of physical harm.

■ Thus, the plain language of the pre-amended EWOC statute requires proof, as an element of the offense, that the accused was a supervisor of an endangered child victim when the conduct or condition giving rise to the offense occurred.[20] In doing so, we reject the interpretation of the trial court, as endorsed by the Commonwealth, that inclusion of the terms "the welfare of" in 18 Pa.C.S. § 4304(a) implies that "the statute does not require that an individual be a 'supervisor of a child' to fall under EWOC's umbrella of criminal liability." TCO, at 183. The plain meaning of the terms of that clause does not support such a construction. And, despite the broad purpose of the EWOC statute as outlined in *Mack*, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). Accordingly, we conclude that the evidence was not sufficient to support

---

**19.** Ironically, then, by promoting an expansive interpretation of the term "welfare" in this manner under the pretense of giving effect to all of the statute's provisions, the import of the term "supervising" is rendered superfluous.

**20.** To be abundantly clear, this does not *necessarily* require that the accused be in the physical presence of the child victim at the time the events or circumstances that gave

rise to the EWOC charge occurred. Physical presence may indeed be a critical factor for other purposes under the statute, particularly considering the vast array of potential facts that might give rise to an EWOC charge. Nevertheless, being in the physical presence of the endangered child is neither conclusive proof of supervision, *see Halye*, nor would its absence, alone, demonstrate that the accused was not a supervisor.

Appellant's conviction for EWOC as a principal actor, because the Commonwealth failed to offer any evidence that Appellant was a supervisor of D.G. or any other child at St. Jerome's.[21]

## Accomplice to EWOC

Although we conclude that Appellant could not be convicted as a principal for EWOC, the jury was charged to consider whether Appellant was culpable for EWOC as Avery's accomplice, presenting an independent avenue by which the jury could have convicted Appellant for a violation of the EWOC statute. Thus, in Appellant's second claim, he contends that the evidence was not sufficient for accomplice liability premised upon three distinct, alternative arguments. He first contends that accomplice liability to EWOC is a legal nullity because applying accomplice liability to EWOC is illogical, as the EWOC statute itself directly prohibits aiding and abetting child abuse or other acts or omissions that constitute a violation of "a duty of care, protection or support." 18 Pa.C.S. § 4304(a). Second, Appellant argues that even if accomplice to EWOC is not a legal nullity, the Commonwealth still failed to meet its burden because the Commonwealth's specific theory of accomplice liability was itself legally improper. Third, he claims that the evidence was still insufficient to support his conviction, even assuming the legal validity of the Commonwealth's theories.

The Crimes Code provides that "[a] person is guilty of an offense if it is committed by his own conduct *or by the conduct of another person for which he is legally accountable,* or both." 18 Pa.C.S. § 306(a) (emphasis added). A person is "legally accountable for the conduct of another person" committing a criminal offense when "he is an accomplice of such other person in the commission of the offense." 18 Pa. C.S. § 306(b).

Our Supreme Court has summarized the requirements for establishing accomplice liability as follows:

It is well-established . . . that a defendant, who was not a principal actor in committing the crime, may nevertheless be liable for the crime if he was an accomplice of a principal actor. *See* 18 Pa.C.S. § 306; *see also Commonwealth v. Bradley,* 481 Pa. 223, 392 A.2d 688, 690 (1978) (the actor and his accomplice share equal responsibility for commission of a criminal act). A person is deemed an accomplice of a principal if "with the intent of promoting or facilitating the commission of the offense, he: (i) solicit[ed the principal] to commit it; or (ii) aid[ed] or agree[d] or attempt[ed] to aid such other person in planning or committing it." 18 Pa.C.S. § 306; *Commonwealth v. Spotz,* 552 Pa. 499, 716 A.2d 580, 585 (1998). Accordingly, two prongs must be satisfied for a defendant to be found guilty as an "accomplice." *See Commonwealth v. Woodward,* 418 Pa.Super. 218, 614 A.2d 239, 242 (1992). First, there must be evidence that the defendant intended to aid or promote the underlying offense. *See id.* Second, there must be evidence that the defendant actively participated in the crime by soliciting, aiding, or agreeing to aid the principal. *See id.* While these two requirements may be established by circumstantial evidence, a defendant cannot be an accomplice simply based on evidence that he knew about

21. Under the umbrella of Appellant's first claim, he raises other quasi-related claims, including constitutional claims that were contingent upon the manner in which we chose to interpret the statute. Because of our disposition in this case, we need not reach Appellant's other embedded claims, and many of them have been rendered moot.

the crime or was present at the crime scene. *See Commonwealth v. Wagaman,* 426 Pa.Super. 396, 627 A.2d 735, 740 (1993). There must be some additional evidence that the defendant intended to aid in the commission of the underlying crime, and then did or attempted to do so. *See id.* With regard to the amount of aid, it need not be substantial so long as it was offered to the principal to assist him in committing or attempting to commit the crime. *See Commonwealth v. Cox,* 546 Pa. 515, 686 A.2d 1279, 1286 (1997).

*Commonwealth v. Murphy,* 577 Pa. 275, 844 A.2d 1228, 1234 (2004).

Appellant's first sufficiency claim regarding his culpability as an accomplice to Avery concerns whether accomplice to EWOC is ever a cognizable offense. Appellant asserts that "[t]here exist no published cases in Pennsylvania that have ever found accomplice liability for EWOC." Appellant's Brief, at 34. Neither the trial court nor the Commonwealth disputes this assertion, and our own review of Pennsylvania decisional law confirms that proposition. It can also be said that no published cases in Pennsylvania have ever ruled that accomplice to EWOC is not a cognizable offense. Thus, Appellant's first argument regarding accomplice liability would certainly be one of first impression for this Court; however, we decline to address it at this time because we can resolve Appellant's case without making such a determination. As set forth below, even if accomplice liability to EWOC is a cognizable offense, we conclude that the specific theory of culpability applied in this case was not legally cognizable and that, nevertheless, there was insufficient evidence to support such a theory.

 Here, the trial court found that the Commonwealth's evidence satisfied both prongs of the accomplice test: 1) that Appellant "intended to promote or facilitate the commission of EWOC[;]" and 2) that Appellant "aided, agreed, or attempted to aid Avery in committing the offense of EWOC." TCO, at 202. We disagree because we conclude that the evidence was not sufficient to prove that Appellant intended to promote or facilitate the commission of EWOC. Accordingly, we also do not reach the second prong.

The trial court found that the first prong was satisfied by evidence that Appellant "intended to prevent scandal and to protect Avery." TCO, at 204. The evidence, viewed in a light most favorable to the Commonwealth, demonstrated that Appellant's first priority in dealing with sexually abusive priests appeared to be the protection of the reputation of the Archdiocese. His second priority appeared to be protection of the reputation of the offending priest. To demonstrate Appellant's general "intent" in this regard, the Commonwealth presented copious evidence of Appellant's mishandling of other cases involving sexually abusive priests.

Constrained by our standard of review, we cannot dispute that the Commonwealth presented more than adequate evidence to sufficiently demonstrate that Appellant prioritized the Archdiocese's reputation over the safety of potential victims of sexually abusive priests and, by inference, that the same prioritization dominated Appellant's handling of Avery. Nevertheless, we do not believe such a showing is sufficient to demonstrate intent to promote or facilitate an EWOC offense. The question of whether Appellant's priorities were more with the reputation of the church, or, instead, with the victims of sexual abuse at the hands of Archdiocese priests, is not at issue in this case. The relevant question is whether there was sufficient evidence to demonstrate Appellant intended to promote or facilitate Avery's endangerment of

D.G. or other children at St. Jerome's. It is not at all clear that these are indistinguishable or interchangeable theories of intent, despite the trial court's implicit suggestion that they are:

> The Commonwealth satisfied its burden to prove that the defendant intended to facilitate the commission of EWOC by showing (a) that the [Appellant]'s overarching pursuits were applicable on a smaller scale in his management of Avery, and (b) that [Appellant] was aware of the 'natural and probable consequences' of his actions in this case.

TCO, at 203.

In the passage above, (a) stands for the proposition that Appellant handled Avery in the same manner in which he handled other cases of sexually abusive priests: he prioritized the reputation of the Archdiocese over the well-being of victims and potential victims of such priests. Again, the Commonwealth provided ample evidence regarding Appellant's pattern of intentionally mishandling other sexually abusive priests with the intent to shelter both the priests and the larger church from disrepute, thus giving rise to a permissible inference for the jury to draw that Appellant acted in conformity with that intent when dealing with Avery. However, implicitly acknowledging that such broad, general intent is not itself sufficient to establish accomplice culpability, the trial court states in (b) that the Commonwealth satisfied its burden by demonstrating that Appellant was aware of the 'natural and probable consequences' of his handling of Avery. By this, the trial court must mean that the conduct which gave rise to Avery's EWOC violation was the 'natural and probable consequence' of Appellant's conduct. The record simply does not support such a theory of culpability.

There was no evidence that Appellant had any specific knowledge that Avery was planning or preparing to molest children at St. Jerome's. Indeed, Avery was not even diagnosed with a mental impairment that suggested he had a predisposition to commit sexual offenses. As such, the notion that Avery was an ongoing, ever-present danger more than a decade after having sexually assaulted R.F. was tenuous at best. Even more tenuous, then, was the conclusion that the natural and probable consequences of Appellant's negligent supervision of Avery were Avery's intentional acts of molestation against a victim unknown to Appellant. Here, the information available to Appellant only suggested Avery's acts of sexual abuse were a byproduct of his alcohol abuse, and there was no evidence that Avery had resumed drinking, or that Appellant knew of such behavior.

Nevertheless, Avery was appointed to a chaplaincy so as to limit his contact with children. There was no evidence that Appellant explicitly or implicitly approved of Avery's supervision of minors at St. Jerome's. In fact, the Commonwealth's own evidence demonstrated that upon Avery's placement at St. Jerome's rectory, that parish's pastor, Father Graham, was told that Avery "was not to be around children and was to live in the parish, be around other priests, and minister to the local hospital." N.T., 5/23/12, at 50. Even if these facts did not extinguish the risk that Avery presented to the parish, the Commonwealth's evidence was not sufficient to support the notion that the natural and probable consequence of Appellant's conduct was Avery's intentional act of molestation (which was the only conduct that could have given rise to Avery's EWOC violation). Such an inference was far too tenuous a proposition to satisfy the Commonwealth's burden of proof, even viewing all the evidence in a light most favorable to the Commonwealth.

We conclude, therefore, that the theories of accomplice liability applied by the trial court in this case were not supported by sufficient evidence. There was no underlying EWOC offense committed by Avery when Appellant facilitated his appointment to the St. Jerome's rectory, or when Avery was permitted to remain at St. Jerome's after Appellant received the influx of negative information about Avery's rehabilitation. When there was an underlying EWOC violation, Appellant's accomplice liability to EWOC was unsupported by sufficient evidence. Appellant did not know or know of D.G., he was not sufficiently aware Avery's supervision of D.G. or any other child at St. Jerome's, nor did he have any specific information that Avery intended or was preparing to molest D.G. or any other child at St. Jerome's. In sum, the evidence was insufficient to demonstrate that Appellant acted with the "intent of promoting or facilitating" an EWOC offense.

Having determined that the evidence was not sufficient to support Appellant's conviction for EWOC either as a principal or as an accomplice, we are compelled to reverse Appellant's judgment of sentence. And, as there are no other offenses for which he was convicted in this case, Appellant is ordered discharged forthwith.

Judgment of sentence *reversed*. Appellant is *discharged*.