J-A23005-13

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| WILLIAM J. LYNN, | |
| Appellant | No. 2171 EDA 2012 |

Appeal from the Judgment of Entered Sentence July 24, 2012
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0003530-2011

BEFORE:  BENDER, P.J.E., DONOHUE, J., and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.:           **FILED December 22, 2015**

Appellant, William J. Lynn, appeals from the judgment of sentence of 3 – 6 years' incarceration, imposed following his conviction for endangering the welfare of children (EWOC).[1]  The instant case is on remand from our Supreme Court, *see Commonwealth v. Lynn*, 114 A.3d 796 (Pa. 2015), for consideration of issues originally raised but not decided by our Court, *see Commonwealth v. Lynn*, 83 A.3d 434 (Pa. Super. 2013).  After careful review, we conclude that the trial court abused its discretion by admitting a high volume of unfairly prejudicial other-acts evidence and, on that basis, we vacate Appellant's judgment of sentence and remand for a new trial.

**Factual Background**

_____

[1] 18 Pa.C.S. § 4304.

Appellant, Monsignor William J. Lynn, served as Secretary for Clergy ("Secretary") for the Archdiocese of Philadelphia ("Archdiocese") from June of 1992 until June of 2004. During that time, Appellant was responsible for, *inter alia*, handling clergy sexual abuse issues that arose within the Archdiocese. In that capacity, Appellant supervised a priest, Edward V. Avery ("Avery"), who molested a ten-year-old altar boy at St. Jerome's Parish in 1999. In his capacity as Secretary, Appellant placed Avery in a rectory at St. Jerome's following allegations of sexual abuse that came to light in 1992, regarding Avery's conduct at another parish between 1978 and 1981. The jury in this case ultimately convicted Appellant of EWOC for his deficient supervision of Avery. A full summary of the facts relating to Appellant's supervision of Avery can be found in our December 26, 2013 Opinion. *See Lynn*, 83 A.3d at 437-45. Additionally, our Supreme Court also provided its own summary of this evidence, and related matters, in its April 27, 2015 decision. *See Lynn*, 114 A.3d at 798-808.

**Procedural History**

As we noted in our previous opinion:

> This case was initiated by a criminal complaint charging Appellant with two counts each of EWOC, 18 Pa.C.S. § 4304, and conspiracy to commit EWOC, 18 Pa.C.S. § 903, relating to his supervision of Avery and another priest, Reverend James Brennan ("Brennan"). Initially, both Avery and Brennan were scheduled to be tried alongside Appellant as co-defendants. However, Avery pled guilty to involuntary deviate sexual intercourse[, 18 Pa.C.S. § 3123,] and conspiracy to commit EWOC on March 22, 2012, after the jury had been selected but

- 2 -

before the Commonwealth began presenting its case.  Brennan remained as Appellant's co-defendant until the case concluded.

Appellant's and Brennan's jury trial commenced on March 26, 2012.  The Commonwealth rested its case on May 17, 2012 and, at that time, the trial court granted Appellant's motion for judgment of acquittal with regard to the Brennan-related conspiracy count, but denied the motion with respect to the remaining counts.  The trial ended on June 22, 2012, when the jury returned a verdict of guilty with respect to the Avery-related EWOC charge, and acquitted him of the Avery-related conspiracy and Brennan-related EWOC charges.[17]  Appellant did not file post-sentence motions.

___

[17] The jury failed to reach a verdict on any of the charges pending against Brennan.

___

On July 24, 2012, the trial court sentenced Appellant to a term of 3–6 years' incarceration for EWOC, graded as a third-degree felony.[18]  Appellant filed a timely notice of appeal on August 8, 2012, and complied in a timely fashion with the trial court's order to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The trial court eventually filed its 1925(a) opinion on April 12, 2013.

___

[18] EWOC is a third-degree felony, rather than a first-degree misdemeanor, "where there is a course of conduct of endangering the welfare of a child[.]"  18 Pa.C.S. § 4304(b).

___

*Lynn*, 83 A.3d at 445.

Appellant originally presented ten questions for our review, which fall generally into four categories:  First, Appellant challenged the sufficiency of the evidence supporting his conviction.  Appellant's Brief, at 16-40.  Second, Appellant asserted the trial court abused its discretion by improperly charging the jury.  *Id*. at 40-54.  Third, he claimed the trial court abused its

discretion by improperly admitting evidence of twenty-one instances of other-acts under Pa.R.E. 404(b)(2). *Id*. at 54-68. Fourth, Appellant claimed the trial court abused its discretion when it denied his motion for a mistrial following prosecutorial misconduct that purportedly occurred during the Commonwealth's closing argument. *Id*. at 68-70.

In an opinion filed on December 26, 2013, this Court reversed Appellant's conviction on sufficiency grounds, concluding that Appellant was not a "supervisor" within the meaning of the EWOC statute and, therefore, that he could not be charged as a principal thereunder. *See Lynn*, 83 A.3d at 453-54. Additionally, we held that there was insufficient evidence to hold him accountable as an accomplice to Avery's commission of an EWOC offense. *Id.* at 457. Consequently, this Court did not address Appellant's non-sufficiency related claims. This Court also did not address certain aspects of Appellant's sufficiency-related claims, particularly with respect to whether Appellant possessed the requisite *mens rea* to commit EWOC as a principal.

Following our decision, the Commonwealth petitioned Pennsylvania's Supreme Court for allowance of appeal. The Supreme Court granted that petition on May 8, 2014, accepting for review the following issues:

> (1) Was the evidence insufficient to prove endangering the welfare of children because defendant did not have direct contact with children?

> (2) Assuming arguendo defendant could not endanger the welfare of children in his individual capacity, but as part of a general scheme placed a known sexual predator under his

control in a position that promoted the risk of further sexual assaults, was the evidence sufficient to convict him as an accomplice?

*Commonwealth v. Lynn*, 91 A.3d 1233 (Pa. 2014) (*per curiam* order).

In an opinion issued on April 27, 2015, the Supreme Court reversed our December 26, 2013 decision, finding that this Court "erred in holding that the EWOC statute required evidence of direct supervision of children and overturning Appellee's conviction on that basis[,]" *Lynn*, 114 A.3d at 827, because "the statute is plain and unambiguous that it is not the child that Appellee must have been supervising, but the child's welfare," *id*. at 823. The Supreme Court declined to answer the second issue upon which it granted the Commonwealth's petition for allowance of appeal, because the Court ostensibly found that "the Commonwealth's evidence was sufficient to sustain the conviction for EWOC as a principal." *Id.* at 827. Finally, the Supreme Court remanded "for further proceedings consistent with" its opinion. *Id.*

Following our Supreme Court's decision, the parties flooded this Court with numerous filings seeking to litigate, *inter alia*, whether this panel could still address aspects of Appellant's sufficiency claim(s) that were left unanswered by our December 26, 2013 opinion, and which were ostensibly outside the scope of our Supreme Court's granting of the Commonwealth's petition for allowance of appeal. *See* Appellant's Application for Additional Briefing, 5/11/2015; *and see* Commonwealth's Answer to Application for Additional Briefing, 5/18/2015. In response, by order dated June 16, 2015,

this Court directed the parties, pursuant to Appellant's request, to provide supplemental briefing on the matter. *See* Order, 6/16/15, at 1-3. The parties complied in a timely fashion; Appellant filed a supplemental brief on June 30, 2015, and the Commonwealth filed its reply on August 5, 2015.

Appellant's original brief presented the following questions for our review:

1. Whether the pre-amended version of 18 Pa.C.S.A. § 4304 (endangering the welfare of children) ("EWOC") did not properly apply to Appellant, Msgr. William Lynn, who was not a parent, guardian or other person supervising the welfare of a child and who had no direct involvement with the child, never met and never knew the child, and whether Appellant's trial as a supervisor under EWOC was a violation of the *ex post facto* clauses of the U.S. and Pennsylvania Constitutions?

2. Whether the trial court erred in allowing the jury to deliberate on whether Appellant can be liable for EWOC as a principal or an accomplice when the Commonwealth failed to provide sufficient evidence to meet its burden of proving that Appellant violated each element of the crime, as either a principal or an accomplice?

3. Whether the lower court's refusal to provide a jury instruction on the definition of person supervising the welfare of a child consistent with *Commonwealth v. Brown*, 721 A.2d 1105 (Pa. Super. 1998)[,] and the model jury charge was reversible error mandating a new trial?

4. Whether the lower court's jury charge on the EWOC element of "knowingly," which provided two directly conflicting definitions, was reversible error mandating a new trial?

5. Whether the lower court's jury charge on the EWOC element of "duty of care," which presupposed that the duty of care element was met and provided examples from civil, rather than criminal, law was reversible error mandating a new trial?

6. Whether the lower court's undue emphasis on accomplice liability, as well as an erroneous definition of accomplice intent,

during its jury charge was reversible error mandating a new trial?

7. Whether the lower court's jury charge about Appellant's liability for endangering other unnamed minors supervised by Edward Avery, when there is no support in Pennsylvania law that EWOC applies to unknown and unknowable children, is reversible error mandating a new trial?

8. Whether the lower court's jury instruction on whether endangering the welfare of a child behavior must be criminal, which permitted the jury in this case to wrongly infer that Appellant violated EWOC, even though there is no underlying criminal conduct that Appellant was aware of, was reversible error mandating a new trial?

9. Whether it was abuse of discretion for the lower court to admit evidence of acts of abuse by 21 other priests, dating to the late 1940's, pursuant to [Pa.R.Evid. 404(b)], and did the [c]ourt err in holding that this evidence passed the probative/prejudicial test of Pa.R.Evid. 403?

10. Whether it was abuse of discretion for the lower court not to grant a mistrial on the basis of the Commonwealth's highly prejudicial summation which included numerous statements not supported by the trial record?

Appellant's Brief, at 4-5.

## Collateral Estoppel/Issue preclusion

The first matter we will address is whether Appellant is precluded from arguing certain sufficiency claims due to the prior decision of our Supreme Court. It is undisputed that Appellant cannot re-litigate his sufficiency claim as it pertains to the matter of statutory interpretation that formed the explicit basis of the Supreme Court's reversal of our prior decision. The Supreme Court specifically granted the Commonwealth's petition for allowance of appeal on that basis, and decided squarely against this Court's interpretation of the EWOC statute.

Appellant contends, however, that his statutory construction argument—based on the theory that he was not within the class of persons held accountable under the statute—was not the only sufficiency issue that he raised regarding his culpability as a principal to EWOC when his appeal was originally before this Court. At that time, Appellant also presented claims pertaining to the *mens rea* element of EWOC, *i.e.*, whether Appellant knowingly endangered the welfare of children and, separately, whether he owed a duty of care to the victim. Appellant argues that he is now entitled to a decision on the merits of these ostensibly distinct sufficiency claims because this Court did not address them in our December 26, 2013 opinion, and because they were not included within the Supreme Court's granting of the Commonwealth's petition for allowance of appeal. The Commonwealth regards our Supreme Court's decision as precluding Appellant from asserting any other sufficiency claims on remand.

Generally speaking,

the doctrine of collateral estoppel, or issue preclusion, applies where the following four prongs are met:

(1) An **issue** decided in a prior action is identical to one presented in a later action;

(2) The prior action resulted in a final judgment on the merits;

(3) The party against whom collateral estoppel is asserted was a party to the prior action, or is in privity with a party to the prior action; and

(4) The party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the **issue** in the prior action.

- 8 -

*Rue v. K-Mart Corp.*, 713 A.2d 82, 84 (Pa. 1998) (emphasis added).

Initially, we note that the "prior action" for purposes of our analysis is the Supreme Court's April 27, 2015 opinion. Also, there is no dispute with regard to the third prong of the *Rue* issue-preclusion test, as Appellant was clearly a party to that action. However, our resolution of the remaining three prongs depends on how broadly or narrowly Appellant's sufficiency claims are construed and, ultimately, on the nature of the Supreme Court's decision itself.

Appellant was convicted of a single offense: EWOC. Appellant argues that his *mens rea* and duty-of-care sufficiency claims pertaining to that offense are stand-alone *issues*. Under that view, Appellant construes the Supreme Court's prior decision in this case as having left these *issues* unresolved on the merits and, therefore, now available for consideration on remand. The Commonwealth, on the other hand, portrays Appellant's multiple sufficiency claims as a single sufficiency issue subdivided into multiple *arguments*. As such, the Commonwealth contends that the Supreme Court's decision constituted a final judgment on the merits of Appellant's sufficiency *issue*, which collaterally estops Appellant from raising alternative sufficiency *arguments* on remand. In our view, both theories are plausible interpretations of the prior history of this case.

We recognize that this Court did not address Appellant's *mens rea* and duty-of-care sufficiency claims in our December 26, 2013 opinion. Furthermore, it is apparent that the Supreme Court did not expressly

address those matters in its April 27, 2015 opinion, nor did the High Court grant review to specifically address them. However, we are nonetheless constrained to agree with the Commonwealth that Appellant cannot now litigate those claims on remand. In doing so, however, we decline to adopt the Commonwealth's reasoning that all sufficiency matters pertaining to the same offense constitute a single sufficiency *issue* composed of multiple *arguments*. Rather, we look to the Supreme Court's decision itself and conclude that, by the manner in which it disposed of the issues accepted for review, the Supreme Court effectively precluded Appellant from arguing his *mens rea* and duty-of-care claims on remand.

As noted above, our Supreme Court granted review of two questions, the first pertaining to Appellant's culpability as a principal in regard to this Court's (incorrect) decision to construe the EWOC statute as requiring direct supervision of children to impose liability for that offense, and the second regarding Appellant's culpability as an accomplice. After resolving the first question against Appellant, the Court then declined to address the accomplice issue, stating that "[b]ecause *we conclude that the Commonwealth's evidence was sufficient to sustain the conviction for EWOC as a principal*, we do not address the separate contention that the evidence was insufficient to sustain the EWOC conviction as an accomplice." ***Lynn***, 114 A.3d at 827 (emphasis added).

Because the Supreme Court declined to address the accomplice-to-EWOC issue on that basis, we must conclude that the High Court intended its

decision to be the final judgment as to any other of Appellant's sufficiency claims attacking his culpability as the principal offender. It would not make sense for the Supreme Court to refuse to answer the accomplice question, after having granted review of the same, if there were remaining principal-based sufficiency issues left unresolved by its decision. If the Supreme Court had anticipated that principal-based sufficiency claims would be addressed on remand, it should have reached the accomplice question. If the Supreme Court had reached that question, a decision resolved in the Commonwealth's favor (reversing our judgment on accomplice liability) would render moot any of Appellant's remaining principal-based sufficiency claims.[2] If resolved in Appellant's favor (affirming our judgment on accomplice liability), then Appellant would have, at least, a colorable argument that the *mens rea* and duty-of-care sufficiency claims were ripe for review on remand and not precluded by collateral estoppel. However, by refusing to answer the accomplice question at all, the Supreme Court has telegraphed to this Court that its decision was a final judgment as to all of Appellant's principal-based sufficiency claims.

This Court cannot explain why the Supreme Court granted review on a single, principal-based sufficiency issue pertaining exclusively to statutory

_____

[2] If Appellant is guilty as an accomplice to the sole EWOC offense at issue, further litigation as to his role as the principal to that same offense would be redundant.

interpretation of the EWOC statute, but then issued a decision effectively precluding litigation of principal-based sufficiency claims, unrelated to Appellant's statutory interpretation arguments, that had never been addressed by this Court in our December 26, 2013 opinion.[3]  Indeed, some parts of the Supreme Court's opinion could reasonably be read to suggest that the Court was not issuing a final judgment as to the other aspects of Appellant's sufficiency claims.[4] However, our interpretation of the Supreme Court's opinion is that it did just that when it declined to address the matter of accomplice liability by concluding that "the Commonwealth's evidence was sufficient to sustain the conviction for EWOC as a principal."  *Lynn*, 114 A.3d

---

[3] The Commonwealth suggests that it was Appellant's burden to file a cross-petition, in response to the Commonwealth's petition for allowance of appeal, in order to preserve his *mens rea* and duty-of-care sufficiency claims that were left unaddressed by our December 26, 2013 opinion.  **See** Commonwealth Brief in Response to Defendant's Supplemental Brief, at 11. The Commonwealth does not cite to any authority to support this theory, and it arguably conflicts with the Commonwealth's other ostensibly unsupported theory—that all sufficiency claims pertaining to a single offense constitute a single, composite issue for purposes of collateral estoppel.  If the latter theory is correct (and it very well may be), it is unclear why Appellant would be required to preserve subparts of the same claim for which the Commonwealth sought review.  In any event, we need not address the validity of these theories, given our interpretation of the Supreme Court's opinion.

[4] At one point, the Supreme Court states: "[W]hether [Appellant] owed a duty of care to the children of St. Jerome's, or to D.G. in particular, is not an issue in this appeal and was not encompassed within our grant of allowance of appeal.  Rather, the legal issue we address concerns solely whether the evidence sufficed to prove [Appellant]'s supervision of the welfare of a child."  **Lynn**, 114 A.3d at 823.

at 827. Accordingly, we are compelled to conclude that Appellant is precluded from raising *any* sufficiency claims on remand.

**Other Acts Evidence**

For ease of disposition, we next address Appellant's ninth claim of error. Appellant contends that the trial court abused its discretion when it admitted other-acts evidence concerning allegations leveled against 21 priests other than Avery and Brennan, as well as evidence concerning the Archdiocese's often bungled response to those allegations, matters for which Appellant was often the Archdiocese's point man in his position as Secretary.[5] Summarizing his claim concerning this evidence, Appellant asserts:

> Of the 32 days of the Commonwealth's case, at least 25 days focused primarily on evidence related to the Archdiocese's handing of 21 other priests, dating as far back as the 1940s and in no way connected to the actions of either Avery or James Brennan or the circumstances surrounding their cases. The trial court improperly permitted the introduction of this evidence pursuant to Pa.R.E. 404(b). These files overwhelmed Appellant's trial and prejudiced the jury against Appellant, as the representative of the Catholic Church. It is clear from the record that the Commonwealth introduced these files to put on trial the entire Archdiocese of Philadelphia, hoping to convict Appellant by proxy for the sins of the entire church.

---

[5] There were at least a few cases where Appellant's involvement predated his appointment as Secretary entirely, although some of other cases involved events that occurred when Appellant was an understudy to the previous Secretary in the management of problematic priests in the Archdiocese.

- 13 -

Appellant's Brief, at 54-55. In his brief, Appellant challenges both whether this evidence fit any of the Pa.R.E. 404(b)(2) exceptions to the prohibition contained in Rule 404(b)(1), and, even if it did, whether the probative value of that evidence was outweighed by its potential for unfair prejudice. Asserting that such evidence was not admissible under the exception to the prohibition against other-acts evidence, Appellant argues that he is entitled to a new trial. Appellant preserved his claim in the lower court by objecting to the admission of this evidence in an answer to the Commonwealth's pretrial Rule 404(b) motion filed on December 12, 2011, during a hearing on the matter which commenced on January 23, 2012, and during trial. Appellant also objected to the cautionary instructions issued by the trial court with regard to this evidence on the basis that they were insufficient to cure the resulting prejudice.

The Commonwealth counters that the trial court did not abuse its discretion, arguing that the other-acts evidence was properly admitted, as it ostensibly served permissible purposes under Rule 404(b), and because the evidence was not unfairly prejudicial. The Commonwealth states:

> The Commonwealth … introduced evidence of 21 other cases probative of (*inter alia*) [Appellant]'s experience in supervising priests who sexually abused minors; his knowledge of their tendency to recidivate and the harm they inflict on their victims; and the priorities he served and methods he used to conceal and facilitate their misconduct in a manner that endangered children. The totality of these facts revealed a systematic pattern of knowledge and concealment, and refuted defendant's attempt to argue that he had no control over such priests or reason to

- 14 -

believe they were dangerous. Such evidence was highly probative.

Commonwealth's Brief, at 38-39.

We review challenges to the admission of 'other acts' evidence for an abuse of discretion. *Commonwealth v. Patterson*, 91 A.3d 55, 68 (Pa. 2014), *cert. denied sub nom.*, *Patterson v. Pennsylvania*, 135 S.Ct. 1400 (2015) ("The admission of evidence of prior bad acts is solely within the discretion of the trial court, and the court's decision will not be disturbed absent an abuse of discretion.").

Our Supreme Court has summarized the relevant law as follows:

> Generally, evidence of prior bad acts or unrelated criminal activity is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity. Pa.R.E. 404(b)(1). However, evidence of prior bad acts may be admissible when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. Pa.R.E. 404(b)(2). In determining whether evidence of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact.

*Commonwealth v. Sherwood*, 982 A.2d 483, 497 (Pa. 2009).

We focus our analysis herein on the balancing test between the probative value of the other-acts evidence, and the potential for that evidence to have unfairly prejudiced Appellant. For purposes of this analysis, we assume that each of the 21 instances of other-acts evidence served at least some minimal probative value with regard to the permissible categories set forth in Rule 404(b)(2) ("This evidence may be admissible for another purpose, such as proving *motive, opportunity, intent, preparation,*

*plan, knowledge, identity, absence of mistake, or lack of accident*.") (emphasis added). Furthermore, we note that the trial court admitted the disputed other-acts evidence *en masse*, balancing its collective probative value against its collective prejudice. ***See*** Trial Court Opinion (TCO), 4/12/13, at 136 ("Cumulatively, this evidence, which was highly probative of [Appellant]'s knowledge, motive, and intent, outweighed its potential for prejudice."). Because Appellant does not specifically claim that the trial court erred by treating this evidence collectively, and because the Commonwealth does not specifically justify the admission of this evidence on a case-by-case basis, we shall review the trial court's admission of the totality of this evidence in kind.

### Probative Value of the Other-Acts Evidence

The trial court correctly indicated that, at trial, "the Commonwealth bore the burden to demonstrate that [Appellant] 'knowingly endangered' a child, as required under § 4304(a), or even beyond that, that he specifically intended that Avery endanger that child as needed to establish accomplice liability." TCO, at 133. The trial court stated that this large volume of other-acts evidence was admissible under Rule 404(b)(2) because it "illuminat[ed] the [Appellant]'s knowledge, motive, and intent[, which] was critical for the jury's determination about [Appellant]'s *mens rea* when he supervised Avery." TCO, at 180 (emphasis in original). The trial court also found that "[t]he substantial probative value of this uncharged evidence outweighed any potential for prejudice." ***Id***.

Explaining further, the trial court noted:

[First, i]n order for the jury to have returned a verdict on the EWOC and conspiracy charges against [Appellant], the jury needed to gain insight into what [Appellant] knew and what he intended when he supervised Avery. [Appellant] did not concede that he knew Avery to be a sexually abusive priest whose presence at St. Jerome's jeopardized the safety of children; therefore, the burden remained with the Commonwealth to establish this critical element.

*** 

Second, the "other acts" evidence was the only way for the jury to gain an understanding of [Appellant]'s thought process. Common sense suggests that all people learn with experience. The more information one acquires, the greater the perspective that he/she may bring to bear upon decisions in the future. [Appellant]'s study of the Secret Archives not only provided him with the information needed to create several lists categorizing the degree of sexual deviance of particular priests; it also taught him how to identify sexually abusive priests, and how the Archdiocese chose to deal with those individuals. It was then incumbent upon [Appellant] to decide whether to perpetuate the practices in place, or to instead take measures that protected children. This Court found that providing the jury with a broad picture of [Appellant]'s knowledge base — about the priests that he managed as well as about the "system" that he inherited — would assist the jury with its determination as to what was actually in [Appellant]'s mind when he facilitated Avery's placement and stay at St. Jerome's.

TCO, at 133-35.

Thus, the trial court characterized the probative value of this evidence as 'substantial.' It is certainly the case that the *volume* of this evidence was substantial. We are less convinced, however, that the nature of this evidence was substantially probative of Appellant's culpability for the actions of Avery and Brennan.

First, the other-acts evidence in question covered a myriad of circumstances that provided only a minimal degree of insight into Appellant's state of mind with respect to his dealings with Avery and Brennan. In this regard, the trial court often overstates the case for the probative value of the other-acts evidence under the rubric of fitting the "knowledge" exception under Rule 404(b)(2). For instance, the trial court indicates that one of the purposes of this evidence was to demonstrate Appellant's knowledge "that sexually abusive priests constituted a danger to children whenever there was an opportunity for unsupervised contact[.]" TCO, at 143 (emphasis omitted). To this end, the trial court cites a particular case where Appellant had acknowledged that placing a priest, Father Thomas Wisniewski, at a parish without a school was preferable to placing that priest at a parish with a school, so as to limit the opportunity for contact with children.[6] *Id.* at 144. While this evidence, strictly speaking, may have tended to demonstrate Appellant's knowledge that child sexual predators should not be allowed to be around children in unsupervised conditions, it does not follow that such evidence was necessary, or even particularly helpful, to conveying this point to the jury. Certainly a jury is capable of such common sense conclusions in the absence of such evidence, and could have concluded,

_____

[6] Appellant was aware at the time he made this statement that Father Wisniewski had previously admitted to frequently having oral sex with a minor high school student.

almost *a priori*, that any person of modest intelligence would recognize the peril. Thus, while probative in the sense that it was somewhat relevant to demonstrating Appellant's knowledge, this evidence was not 'substantially probative,' nor was it necessary or critical evidence of Appellant's *mens rea*.

Illustrative of this point is **Commonwealth v. Smith**, 956 A.2d 1029 (Pa. Super. 2008). In that case, the appellant, who had severely injured his infant son by shaking him, claimed that the Commonwealth failed to demonstrate the "knowing" element of EWOC. He argued that he was at most criminally negligent for endangering his son because he had not been "instructed by his doctor about the dangers of Shaken Baby Syndrome." **Id.** We dismissed his sufficiency claim, stating:

> It takes nothing more than common sense for an adult, let alone an experienced father such as [the a]ppellant, to know that violently shaking an infant child with enough force to cause an abusive head trauma could threaten the child's physical and/or psychological welfare. Thus, there was sufficient evidence to support the jury's decision that Appellant knowingly violated a duty of care, protection or support.

**Id.** at 1038-39. Likewise, in the instant matter, while the evidence concerning Father Wisniewski may have tended to demonstrate Appellant's knowledge that sexual predators endanger children in unsupervised conditions, common sense demonstrates that point with nearly equal vigor. Neverthess, the disturbing facts of Father Wisniewski's molestation of children, which were not an issue at Appellant's trial, were recounted before Appellant's jury so as to provide the necessary context for the admissible evidence concerning Appellant's "knowledge."

Another basis cited by the trial court for the admission of the high volume of prior acts evidence was to establish Appellant's motive to protect the Archdiocese's reputation at the expense of the victims of clergy sexual abuse. With reference to the motive exception to Rule 404(b), this Court has held that:

> The mere identification of similarities between the prior bad acts and the crime at issue … does not establish motive. Instead, … there must be a firm basis for concluding that the crime currently on trial "grew out of or was in any way caused by the prior set of facts and circumstances."

*Commonwealth v. Ross*, 57 A.3d 85, 101 (Pa. Super. 2012) (internal citation omitted).

The trial court admitted such 'motive' evidence regarding several priests who were repeatedly transferred to different parishes after their sexual abuse of minors came to light. *See* TCO, at 146-148. This evidence included damning statements from Appellant's predecessors concerning the priorities of Archdiocese officials in dealing with sexual predators in the Church. However, a substantial volume of this evidence concerned the bad acts of priests, and the Archdiocese's response thereto, that predated Appellant's tenure as Secretary by many years, and in some cases, decades. Thus, even if this evidence tenuously provided the bare minimum degree of probative value to meet the 'motive' exception to the Rule 404(b) prohibition, it only did so by suggesting that Appellant followed the motives of his predecessors, and not through Appellant's own prior conduct. Moreover, much of this evidence varied wildly in terms of its probative value.

The trial court summarizes some of this evidence as follows:

Immediately after accusations came to light in August 1964 that Father Joseph Gausch found a boy at a local swimming pool, took him to the rectory of Our Lady of Peace, and molested the child, he was transferred to another parish. In early 1977, Father Gausch admitted to having touched another boy, D.C., on the "backside" and to having told him that he had a beautiful body; within a month, Father Gausch was transferred to another parish. Father Raymond Leneweaver, who had admitted to engaging in a sexually abusive relationship with a student in 1968, was caught providing alcohol to students in June 1971. By September of that year, Father Leneweaver was reassigned as an assistant pastor at a different parish. In September 1980, after Father Leneweaver admitted to abusing three others, Monsignor Statkus assigned Father Leneweaver to St. Joseph's the Worker in Bucks County, PA "because it is one of the few remaining areas where his scandalous actions may not be known." Towards the end of 1981, the pastor of St. Titus's Parish in Norristown, PA informed the Archdiocese about the possibility of "scandal in the parish" as a result of allegations that Father Francis Trauger had sexually abused a boy named S.K. Monsignor Statkus met with Father Trauger, who stated that he had shared a bed with S.K. and massaged the boy's "chest and back." Two days later, Father Trauger was transferred to St. Matthew's Parish in Philadelphia, PA. In July 1977, Father Nicholas Cudemo was confronted with allegations that he had a number of affairs with female minors, and may have even impregnated one of them. Father Cudemo admitted to being "attracted to younger girls," but denied wrongdoing. Monsignor Statkus noted that he had reservations about transferring Father Cudemo, as he had "been changed twice previously to other high schools and yet the particular friendships have continued." Nonetheless, Monsignor Statkus transferred Father Cudemo to another parish roughly two months later. Following Father Edward DePaoli's guilty plea to receiving child pornography in federal court, Cardinal Bevilacqua called Father DePaoli to his office for a meeting in May 1988; Cardinal Bevilacqua told him it was "more advisable for [DePaoli] to return to the active ministry in another diocese" and assisted with Father DePaoli's placement in the Metuchen, NJ diocese.

TCO, at 14-48.

Appellant did interact with some of these priests during his own tenure. However, Father Gausch was not in active ministry when Appellant received new information in 1994 concerning Gausch's previously unknown molestation of a victim in the 1980's, as Father Gausch had retired in 1992. There is also no indication in the record that Appellant had a supervisory role over Father Gausch when the priest was repeatedly reassigned to different parishes in the 1960's and 1970's following allegations of sexual impropriety. Thus, it cannot be fairly said from Appellant's dealings with Gausch that Appellant had exalted the Archdiocese's reputation over an ongoing risk to children, which ostensibly was the purpose for which this other-acts evidence was admitted against him. At best, this evidence demonstrated that Appellant valued the Archdiocese's reputation over the value inherent in exposing Father Gausch's prior misdeeds. That motive only tenuously relates to the distinct motive sought to be proven by the Commonwealth— that Appellant actively exposed children to the risk of molestation so as to protect the Archdiocese from scrutiny.

Indeed, it strains credulity to construe the crimes for which Appellant was charged as having grown "out of" or as having been "caused by" the Archdiocese's prior dealings with Gausch. ***Ross***, ***supra***. Nevertheless, even if the evidence concerning Father Gausch was properly construed as probative as to motive (a highly questionable proposition), it was certainly not *highly* or *substantially* probative of Appellant's motive in dealing with Avery and Brennan.

- 22 -

By contrast, Appellant's dealings with Father Cudemo were more relevant and probative of this motive. Appellant spent the better part of a decade addressing accusations against Cudemo, and had concluded that Father Cudemo was a diagnosed pedophile. TCO, at 32. Despite this, Appellant, at the behest of or in conjunction with Cardinal Bevilacqua, permitted Father Cudemo to perform public Mass as a retired priest "in good standing," and repeatedly misrepresented Father Cudemo's past to individuals who came forward with new allegations against the priest. *Id.* Still, it not clear that Appellant's current crimes grew "out of[,]" or were "caused by[,]" Appellant's prior dealings with Cudemo. *Ross*, *supra*.

This contrast between the evidence concerning Fathers Cudemo and Gausch highlights a failure to distinguish between significantly probative and minimally probative evidence. While the evidence concerning Father Cudemo did serve to demonstrate motive, based on ostensibly similar circumstances to Appellant's dealings with Avery and Brennan, the evidence concerning the Archdiocese's dealings Father Gausch only tended to demonstrate this in the most attenuated and remote fashion, if at all. And, while more probative of Appellant's motive than the evidence concerning Father Gausch, it is a stretch to say the evidence concerning Father Cudemo was "highly" probative of Appellant's motive in this case. Despite some similarities, Appellant's experiences with Father Cudemo were far from identical to his experiences with Avery and Brennan.

Relatedly, the trial court also allowed evidence of Appellant's predecessors' overreliance on the diagnoses of psychiatric professionals:

> [Appellant]'s predecessors required psychiatric professionals who evaluated priests to relay their conclusions to the Archdiocese. The Secret Archives revealed that [Appellant]'s predecessors grounded their decisions about how to manage priests in the conclusions offered by the Archdiocese's doctors, despite the fact that their findings were often facially incredible.

TCO, at 152.

The probative value of a different Secretary's dealings with an unrelated priest's (mis)diagnosis had, at best, a remote and vague bearing on Appellant's motive in this case. It again strains credulity that Appellant's crimes in this case grew "out of[,]" or were "caused by[,]" Appellant's predecessor's overreliance on psychiatric professionals' examinations of priests other than Avery and Brennan. **Ross**, **supra**. The trial court's own understanding of the purpose of this evidence reveals that its introduction was not even based directly upon Appellant's own prior conduct, but instead on his association with the Archdiocese:

> [Appellant]'s predecessors might have created the impression that the Archdiocese was acting responsibly, but blindly adopting recommendations proffered after inadequate psychological testing only helped sexually abusive priests to remain at large.

TCO, at 153.

The thread that connected these events to Appellant's case was his possession and control of the Secret Archive, which documented Appellant's predecessors' mishandling of problematic priests within the Archdiocese. However, evidence of Appellant's predecessor's overreliance on the

diagnoses of psychiatric professionals was purportedly offered to demonstrate Appellant's motive with respect to his failure to mitigate or eliminate the risks posed by Avery and Brennan to children in the Archdiocese. The conduct of different people in relation to different sexual predators, different victims, and in different times, is on its face minimally probative of this motive, if probative at all.

Also typical of this marginally probative other-acts evidence of motive were the facts presented to the jury that were related to Father Leneweaver. In 1968, Father Leneweaver admitted to Archdiocese authorities that he had engaged in a two-year homosexual affair with a Catholic high school student. Despite this behavior, he was not removed from his post at Cardinal O'Hara High School.[7] Three years later, the principal at Cardinal O'Hara reported that Father Leneweaver had been supplying alcohol to minors. As a result, in 1971, Father Leneweaver was reassigned to be an assistant pastor at St. Monica's Parish. By 1975, it came to light that Father Leneweaver had engaged in sexual activities with three students at St. Monica's. He was given a leave of absence and evaluated by a psychiatrist who ultimately concluded that Father Leneweaver showed no signs of a serious mental disorder, and had merely acted out in reaction to difficulties with his family. Father Leneweaver was subsequently reassigned, yet again,

---

[7] The student/victim was from a different Catholic high school.

to St. Agnes Parish, but without his new assignment being published. Five years later, it came to light that Father Leneweaver had molested an eighth-grade student at St. Agnes on multiple occasions. After confessing to these acts, Father Leneweaver was sent for treatment at St. John Vianney. During this time, Archdiocese authorities learned that Father Leneweaver was visiting the homes of St. Agnes parishioners, including those with minor children. Further investigation revealed that Father Leneweaver had made sexual advances toward those children as well. After these events, Father Leneweaver was again assigned to another Parish in Bucks County. With regard to this assignment, the Chancellor of the Catholic Schools in the Archdiocese told one of the doctors who had counseled Father Leneweaver that the Bucks County assignment was made "because it is one of the few remaining areas where his scandalous actions may not be known." TCO, at 116 (quoting from Exhibit C-134, N.T., 3/29/2012, at 59). Ultimately, Father Leneweaver himself requested a permanent leave of absence from the Archdiocese in 1980, which apparently was granted.

Appellant placed Father Leneweaver on a list of priests who were "Guilty of Sexual Misconduct with Minors" in 1994, based on Father Leneweaver's admissions in 1968, as recounted in the Secret Archive. In 1997, or thereabouts, Father Leneweaver requested to be reinstated in the Archdiocese, and Appellant recommended to Cardinal Bevilacqua that Father Leneweaver not be accepted back. In making this recommendation, Appellant stated that Father Leneweaver presented too great a risk to "the

diocese, for the Bishop, for himself and the legal repercussions of having him in ministry." TCO, at 117 (quoting Exhibit C-152, N.T., 3/29/2012, at 78-80).

The trial court admitted this evidence as probative of Appellant's motive to "[k]eep parishioners in the dark" about clergy sex abuse. *Id.* at 154. However, it again strains credulity to believe that Appellant's criminal conduct relating to Avery and Brennan grew "out of[,]" or was "caused by[,]" Appellant's limited dealings with Leneweaver. Appellant did not assist Father Leneweaver in any way, did not appoint or recommend that he be appointed to any position within the Archdiocese, and, in fact, Appellant recommended that Father Leneweaver *not* be permitted to return to the Archdiocese in any capacity. Thus, the likelihood that Appellant's current crimes grew "out of[,]" or were "caused by[,]" the facts concerning Father Leneweaver is virtually nil. *Ross*, *supra*. While Appellant's recommendation to *not* permit Father Leneweaver to return may have been callous with respect to the threat his return might present to potential victims, it is clear that this evidence was, at best, of trivial probative value as to Appellant's motive with regard to the offenses concerning Avery and Brennan.

Although the preceding evidence is largely representative of the other-acts evidence at issue, the magnitude of the other-acts evidence at issue is so large that further consideration of its probative value is impractical, as additional analysis could easily consume dozens if not hundreds of additional

pages. Having thoroughly reviewed this evidence, however, we can confidently conclude that the trial court's description of this evidence as being "highly probative" of Appellant's *mens rea* with respect to crimes related to Avery and Brennan is a substantial overstatement that risks mischaracterizing the nature of the specific evidence actually introduced. Some of this evidence, including but not limited to the examples cited above, is only marginally probative of any Rule 404(b)(2) category. None of the evidence concerned the actual victim(s) in this case, and none of it directly concerned Appellant's prior dealings with either Avery or Brennan. In this regard, the trial court has apparently mistaken quantity for quality in construing the probative value of this evidence *en masse*. Consequently, we disagree with the trial court's characterization, and conclude instead that, while some of this evidence was probative of Appellant's *mens rea vis-à-vis* the various Rule 404(b)(2) categories, the probative value of significant quantities of this evidence was trivial or minimal.

**Potential Prejudice of the Other-Acts Evidence**

Merely crossing the threshold of demonstrating that other-acts evidence was probative of some Rule 404(b)(2) category does not, by itself, demonstrate admissibility. "In a criminal case this evidence is admissible **only** if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2) (emphasis added). In this context, "'[u]nfair prejudice' means a tendency to suggest decision on an improper basis or to

divert the jury's attention away from its duty of weighing the evidence impartially." ***Commonwealth v. Dillon***, 925 A.2d 131, 141 (Pa. 2007).

Often cited in conjunction with this balancing test, as invoked by the trial court in this case, is our Supreme Court's elucidation on the topic of prejudice in ***Commonwealth v. Lark***, 543 A.2d 491 (Pa. 1988):

> Not surprisingly, criminal defendants always wish to excise evidence of unpleasant and unpalatable circumstances surrounding a criminal offense from the Commonwealth's presentation at trial. Of course, the courts must make sure that evidence of such circumstances have some relevance to the case and are not offered solely to inflame the jury or arouse prejudice against the defendant. The court is not, however, required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged, as appellant would have preferred.

**Id.** at 501.

Naturally, as the ***Lark*** Court suggests, relevant evidence of Appellant's culpability for the charged offenses should not be excluded merely because it tends to demonstrate his guilt. However, our Supreme Court has also advised that, "to be admissible under the [motive] exception, evidence of a distinct crime, **even if relevant to motive**, 'must give sufficient ground to believe that the crime currently being considered grew out of or was in any way caused by the prior set of facts and circumstances.'" ***Commonwealth v. Roman***, 351 A.2d 214, 218-19 (Pa. 1976) (emphasis added). Thus, we must not forget that the rule being applied is that other-acts evidence is by default inadmissible *unless* a Rule 404(b)(2) category or similar justification

applies, *and* the probative value of that evidence outweighs its *potential* for prejudice. The burden is on the party seeking admission to demonstrate the applicability of the exception to the general rule; in this case, that burden fell on the Commonwealth. There is no presumption of admissibility of other-acts evidence merely because it is somewhat relevant for a non-propensity purpose.

The context of the **Lark** Court's warning is relevant to the balancing test in the instant case. In **Lark**, the appellant disputed the propriety of trying him jointly for multiple offenses, claiming that the crimes "were not of a similar character and had not arisen from a single criminal transaction, and that he would be unduly prejudiced by consolidation of these offenses at trial." **Lark**, 543 A.2d at 496. The **Lark** court determined that Lark was not unduly prejudiced by consolidation based on the following facts: Lark had robbed the victim at gunpoint, but was immediately apprehended thereafter. The day before that victim was scheduled to testify against Lark at the preliminary hearing for the robbery, the victim was murdered at his place of business. Witnesses testified that Lark had made statements while out on bail for the robbery indicating his intent to kill the victim before he was allowed to testify, and that, after the killing, Lark had bragged about it. Evidence also demonstrated that Lark later threatened both prosecutors and detectives involved in the robbery and murder cases.

Thus, in **Lark**, the other-acts evidence at issue directly involved Lark's attempt to cover his tracks following his robbery of the victim, which

manifested with the murder of the victim and the multiple threats issued to the various authorities who were attempting to bring him to justice. Thus, the facts that constituted the multiple crimes for which Lark was jointly tried were inextricably intertwined. Lark's first crime was the direct impetus that motivated each subsequent crime. Notably, all of the other-acts/other-crimes evidence at issue in *Lark* related directly to Lark's own aberrant behavior. Moreover, a substantial portion of other-acts evidence at issue in *Lark* directly provided the factual basis for the charged offenses for which Lark was being jointly tried.

Appellant's mishandling of priests other than Avery and Brennan, who molested different children, and in different circumstances, was not clearly within the web of facts pertaining to Appellant's misconduct with Brennan and Avery. This is true regardless of whether his actions in those other cases tended to speak to an overarching motive to protect the Church and/or Archdiocese from ill-repute at the expense of the safety of children in the Archdiocese. Moreover, the other-acts evidence that did not relate to Appellant's prior conduct, but instead to the conduct of his predecessors, was not at all within the web of facts that pertained to Appellant's mishandling of Avery and Brennan.

Notably, the trial court spends virtually no time addressing the prejudicial value of the copious amounts of other-acts evidence at issue in this case. After discussing the probative value of this evidence at great length, *see* TCO, at 132-180, the trial court summarily concludes that any

such prejudice was outweighed by its probative value, *id.* at 180. Therefore, in more than 160 pages discussing other-acts evidence (110 plus pages summarizing the other-acts evidence, and 50 plus pages of analysis), the trial court dedicated precisely one sentence to discussing the potential for that evidence to prejudice Appellant.

Nevertheless, we conclude that the potential for unfair prejudice was great when the court admitted evidence of the sexual molestation of children at the hands of sexually deviant priests other than those directly at issue in the case at hand. When that evidence involved acts that occurred long before Appellant bore any responsibility for problematic priests within the Archdiocese, the potential for unfair prejudice was even greater.

By Appellant's calculation, the presentation of this contested evidence consumed more than three-quarters of his trial (25 of 32 days)—an estimate undisputed by the Commonwealth and, by our own estimation, a reasonably accurate representation of the bulk of Appellant's trial. Indeed, this imbalance is also reflected in the trial court's summary of the evidence. The court's summary of facts pertaining to Appellant's handling of Avery encompasses approximately 17 pages of the court's Rule 1925(a) opinion, *see* TCO, at 2-18, while the court's summary of the other-acts evidence

consumes nearly 113 pages of that same opinion, *see* TCO, at 20-132.[8]

Thus, regarding the trial court's summary of the facts adduced at Appellant's trial, more than 85% of that summary concerns the acts of, and the Archdiocese's response to, priests other than Avery and Brennan. By any formulation, therefore, it is clear that the vast majority of evidence offered by the Commonwealth against Appellant concerned his handling of sexually abusive priests in cases not directly related to the offenses for which he was tried or, in some cases, the activities of sexually abusive priests who were predominately handled by Appellant's predecessors.

We recognize that our Supreme Court has suggested that a high volume of potentially prejudicial, other-acts evidence is not, by itself, grounds for excluding it. In *Commonwealth v. Boczkowski*, 846 A.2d 75 (Pa. 2004), the appellant was convicted of murdering his wife, Maryann, by strangulation. The circumstances of Maryann's death suggested that, after strangling her, the appellant had staged the scene to make it appear as if she had drowned in their hot tub. On appeal, the appellant argued that he was unduly prejudiced by the Commonwealth's presentation of other-acts evidence concerning the suspicious death of his former wife, Elaine, who had

---

[8] This latter figure does not include the trial court's legal analysis concerning the admission of the 'other acts' evidence, which required an additional 49 pages in its opinion. *See* TCO, at 132-180.

been found dead in a bathtub just four years prior to the death of his current wife, under remarkably similar circumstances.

The appellant in *Boczkowski* did not dispute that this evidence could be admitted for limited purposes (motive, lack of mistake, etc.) under Rule 404(b)(2). Instead, he argued that the "sheer volume of the testimony concerning Elaine's death was … an abuse of the trial court's discretion." *Boczkowski*, 846 A.2d at 93. In this regard, the appellant highlighted that "'twenty-one percent' of the Commonwealth's witnesses testified exclusively about Elaine's death in North Carolina, while a number of the witnesses who testified regarding Maryann's murder also testified about Elaine's murder. [The a]ppellant calculate[ed] that 'fifty-two percent' of the Commonwealth's witnesses testified in whole or in part about Elaine's death." *Id.*

Our Supreme Court rejected this claim—not by disputing the assertion that a high volume could influence the balancing of probative value versus potential for prejudice of other-acts evidence—but by noting the focused nature of that evidence and the presence of cautionary instructions.[9] Notably, despite the high volume of that evidence and the high potential for prejudice, that evidence focused on a single prior bad act—the killing of the

_____

[9] The evidence had also conformed to a previous decision of the Superior Court addressing the Commonwealth's interlocutory appeal from a pre-trial order that had precluded the Elaine-related evidence on the basis that it was not admissible to show lack of mistake in the Commonwealth's case-in-chief. The trial court had initially ruled that evidence of lack of mistake was only admissible to rebut a defense that her death was accidental.

- 34 -

appellant's previous wife—in virtually identical circumstances as the offense for which the appellant was being tried. Thus, while evidence of the appellant's prior wife's suspicious death may have been highly prejudicial in a general sense, both in that it qualitatively described the details of a prior suspicious death and quantitatively made up a substantial portion of the Commonwealth's case, that prejudice was not unfair precisely because it was profoundly relevant to prove motive, absence of mistake, or lack of accident, given the substantial similarities between the two deaths.

By contrast, in the instant case, the high volume of prejudicial other-acts evidence involved Appellant's supervision of other priests with varying psychiatric diagnoses, priests who committed crimes or bad acts in a wide variety of different circumstances, against different types of victims and, in some cases, which did not even involve Appellant's prior acts at all, but instead those of his predecessors. This was not a case like *Boczkowski* where the jury was provided a significant volume of facts that constituted contextual details concerning a single prior bad act, and one which was nearly identical to the crime for which the appellant was being tried. Instead, there were numerous prior bad acts introduced in this case that varied greatly in their relevance to the purpose for which they were admitted. Thus, it is not just the volume of other-acts evidence that is notably greater than was at issue in *Boczkowski*, the other-acts evidence in this case was, by and large, not nearly as probative of or relevant to the Rule 404(b)(2) exceptions under which it was admitted.

The trial court indicates that any unfair prejudice in this case was adequately mitigated by the court's cautionary instructions, and that the split verdict indicates that the jury was able to carefully consider the evidence for its proper purpose. The Commonwealth agrees, arguing that any undue prejudice was harmless because it was "eliminated by the court's limiting instructions." Commonwealth's Brief, at 42. As proof of this, the Commonwealth directs our attention to the fact that Appellant was acquitted "of three of the four offenses charged[,]" *id.* at 43, an argument that dovetails with the trial court's own analysis, *see* TCO, at 137-38.

First, we reject the notion that the jury's verdict, *by itself*, is particularly strong or useful evidence that the trial court's instructions effectively eliminated all or most of the unfair prejudice that resulted from the admission of vast quantities of other-acts evidence. A different narrative could easily be constructed to suggest just the opposite conclusion: that the evidence of Appellant's guilt was demonstrably weak by virtue of the three acquittals, and that the single conviction reflected the effect of the unduly prejudicial evidence—or that it reflected the jury's intent to punish Appellant as a scapegoat for the policies of the Archdiocese, despite having concluded that his culpability for these specific offenses was not proven beyond a reasonable doubt. However, rather than adopting any of these narratives, it is preferable judicial policy to avoid such speculation. This Court is ill-suited to the task of reading the minds of twelve jurors so as to ascertain why they chose to acquit Appellant of some charges but not others, and it is beyond

our province to engage in such speculation in any event. Instead, our evaluation must center on whether the trial court abused its discretion when it was asked to determine whether "the probative value of the evidence outweighs its **potential** for unfair prejudice." Pa.R.E. 404(b)(2) (emphasis added).

The trial court cites **Commonwealth v. Williams**, 9 A.3d 613 (Pa. 2010), to suggest that it may evaluate the jury verdict to assess the balance between the probative value and potential prejudice of the at-issue prior-acts evidence. **See** TCO, at 137-138. Notably, the quoted language in the trial court's opinion does not even appear in that case, although the **Williams** Court did opine on the topic of prejudice. Nevertheless, **Williams** does not stand for the proposition that we may, on direct review, rely upon the jury verdict to determine whether jury instructions were sufficient to mitigate unfair prejudice resulting from the admission of copious amounts of other-acts evidence. Indeed, the **Williams** Court did not engage in the balancing test that is at issue with regard to the admission of other-acts evidence under Rule 404 at all, but instead dealt with the prejudice prong of ineffectiveness of counsel claim. The prejudice standard on direct review of claims of evidentiary error is not as strict as that which is required for proving ineffectiveness claims on collateral review. As our Supreme Court has explained:

> Derivative claims of ineffective assistance of counsel are analytically distinct from the defaulted direct review claims that were (or could have been) raised on direct appeal.

> ***Commonwealth v. Collins***, 585 Pa. 45, 888 A.2d 564, 572–73 (2005). As noted, **Strickland** [**v. Washington**, 466 U.S. 668 (1984),] requires a showing of actual prejudice, not the presumed prejudice arising from [***United States v.***] ***Cronic***[, 466 U.S. 648 (1984)], nor the harmless error standard that governs ordinary claims of trial court error on direct review, nor the presumption of harm arising on direct review [certain claims]. This Court has long recognized the distinction between ***Strickland*** prejudice and the harmless error standard applicable in the direct review context, and this distinction can be outcome-determinative. ***See***, ***e.g.***, ***Commonwealth v. Howard***, 538 Pa. 86, 645 A.2d 1300, 1307 (1994).

***Commonwealth v. Reaves***, 923 A.2d 1119, 1130 (Pa. 2007).

Here, we review the trial court's evidentiary decision for its *potential* to cause unfair prejudice in relation to the probative value of that evidence, not for *actual* prejudice as is required to assess derivative claims on collateral review. In light of this distinction, the jury's verdict tells us very little about whether it was able to dutifully sort through the barrage of other-acts evidence in accordance with the trial court's cautionary instructions.

Second, we disagree that the trial court's limiting/cautionary instructions eliminated the potential for unfair prejudice. The trial court indicates that it instructed the jury "on nine different occasions about the limited scope for which the 'other acts' evidence could be considered." TCO, at 136. The court went on say:

> Each charge was the same or a very slight variation on what this Court stated on March 29, 2012:
>
> > Good morning, ladies and gentlemen. I'm going to give you this morning, and I will give you through the trial this same or similar instruction. It's called a cautionary charge. It just alerts you about how you should handle or accept certain evidence. You will hear evidence concerning

alleged improper behavior up to and included [sic] the alleged sexual abuse of children by priests other than what has been alleged as to Edward Avery and James Brennan. In some of these cases, Defendant Lynn handled these allegations personally and documented his actions and recommendations in memorandum — or I guess memoranda, since it's plural.

As regards [sic] to other cases, he reviewed documents pertaining to these allegations in files kept in the Secret Archives of the Archdiocese of Philadelphia. This so-called other-acts evidence is being admitted for limited purposes. The Commonwealth may introduce evidence relating to Defendant Lynn's handling of or knowledge about accusations made against priests other than Edward Avery and James Brennan for the following purposes:

1. To assist the jury in assessing motive, opportunity, intent, preparation, plan, knowledge or absence of mistake or accident.

2. To allow the jurors to understand the complete story so they can draw the proper inferences from the evidence.

3. To demonstrate that Defendant Lynn's actions in this case were part of a common plan, scheme and design.

4. To demonstrate the relationship between Defendant Lynn, other Archdiocese officials, and accused priests in order to allow the jury to determine whether Defendant Lynn participated in a conspiracy to endanger children supervised by Edward Avery and James Brennan.

Of course, it is for you and you alone, you the jurors, to determine whether you believe this evidence, and if you do believe it, whether you accept it for the purpose proffered or offered to you. You may give it such weight as in your judgment it deserves, but only for the limited purposes that I have just described for you. Defendant Monsignor Lynn is not on trial for committing or conspiring to commit any of the acts attributed to other priests other than what is alleged as to Edward Avery and James Brennan, and is not on trial for endangering the welfare of any of the children allegedly abused or molested by priests other than Edward Avery and James Brennan. You may not consider the evidence of these other acts as a substitute for proof

that Defendant Monsignor Lynn committed the crime of endangering the welfare of children supervised by Edward Avery and James Brennan.

You may not consider this evidence as proof that Defendant Monsignor Lynn has a bad character or any propensity to commit crimes. Remember that Defendant Monsignor Lynn is on trial here because he has been accused of endangering the welfare and conspiring with others to endanger the welfare of children that were supervised by Edward Avery and James Brennan, not for these other acts. So I just wanted you to be aware of that so that you can have it in the proper context. I will give you this repeatedly throughout the trial because a great deal of the evidence that you are hearing concerns these other matters and not the actions as are alleged against Edward Avery and James Brennan. Thank you.

N.T. 3/29/2012 at 22-25.

TCO, at 136-37.

We must assess the effect of these cautionary instructions in the context of this case. We begin with the presumption that a jury follows the curative instructions of the trial court. *Commonwealth v. Hairston*, 84 A.3d 657, 666 (Pa. 2014) ("Jurors are presumed to follow the trial court's instructions."). However, this presumption is not unassailable. Our Supreme Court has indicated that "when examining the potential for undue prejudice," in the context of Rule 404, "a cautionary jury instruction *may* ameliorate the prejudicial effect of the proffered evidence." *Id*. (emphasis added). In the exceptional circumstances of this case, we conclude that this presumption has been overcome by the varied and often questionable probative value of the admitted other-acts evidence, its significant potential

for unfair prejudice, and, importantly, the vast quantity of other-acts evidence that the jury was asked to evaluate.

In this regard, although the trial court issued some variation of the above instruction on multiple occasions, we do not believe the instruction carried the same weight that it would have carried in relation to more focused and less voluminous other-acts evidence. The other-acts evidence dominated Appellant's trial to such a degree that we are unable to conclude that the jury could have dutifully followed the court's instructions, which effectively demanded that the jury ignore the elephant in the room. The elephant being the tendency of the other-acts evidence to suggest that Appellant had the general propensity to coddle sexual predators based on facts not directly related to the crimes for which he was being tried. While the jury might reasonably be expected to follow such instructions in normal circumstances, the high volume of other-acts evidence involved in this case, coupled with is high potential for prejudice and minimal probative value, made such an expectation unreasonable.

Neither the trial court nor the Commonwealth cite to any case where this presumption was applied in circumstances substantially similar to the instant case in terms of the quantity and quality of the at-issue other-acts evidence. Likewise, nowhere in our review of the numerous cases applying the aforementioned presumption have we found a case where the presumption was applied in such exceptional circumstances. As discussed above, in *Boczkowski,* the volume of prior-acts evidence was high, but the

scope of that evidence concerned only a single prior bad act—the defendant's ostensible/alleged killing of his former wife. Our Supreme Court indicated in that case that "the court's repeated cautionary charges concerning the limited purpose of the evidence served to minimize any potential for unfair prejudice." *Boczkowski*, 846 A.2d at 93. In the instant, case, however, the volume of other-acts evidence was much higher, and its scope spanned decades of prior bad acts committed within and by the Archdiocese, much of which had little to do with Appellant's supervision of Avery and Brennan. The jury's ability to apply the court's instructions dutifully to such a high volume of other-acts evidence was likely to be significantly hampered. Thus, we reject the trial court's conclusion, as well as the Commonwealth's corresponding argument, that any unfair prejudice resulting from the admission of other-acts evidence in this case was ameliorated by the court's cautionary instructions.

In sum, we conclude that the probative value of the individual portions that made up the large quantity of other-acts evidence in this case differed greatly. A limited portion of that evidence was substantially relevant to, or probative of, permitted uses under Rule 404(b)(2), but far more was only marginally relevant for such purposes. The potential for this evidence to unfairly prejudice Appellant was high, both because it involved the sexually abusive acts of numerous priests committed against children over several decades, and because of the high volume of the evidence admitted. Therefore, we conclude that the probative value of that evidence, *in toto*, did

not outweigh its potential for unfair prejudice, and that this potential prejudice was not overcome by the trial court's cautionary instructions. Consequently, we hold that the trial court abused its discretion in its application of Rule 404(b)(2). As our judgement requires that Appellant receive a new trial, we decline to address Appellant's remaining claims of error.

Judgment of sentence **vacated**. Case **remanded** for a new trial. Jurisdiction **relinquished**.

Judge Musmanno joins this memorandum.

Judge Donohue files a concurring and dissenting memorandum.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>12/22/2015</u>